**Joseph E. CORCORAN, Appellant (Defendant),**

v.

**STATE of Indiana, Appellee (Plaintiff).**

No. 02S00–9805–DP–293.

Supreme Court of Indiana.

Sept. 5, 2002.

P. Stephen Miller, John C. Bohdan, Glasser and Ebbs, Fort Wayne, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, James B. Martin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Joseph E. Corcoran was under stress because his sister's upcoming marriage would necessitate his moving out of her house. And his brother said Corcoran could not move in with him.

He awoke one afternoon to hear his brother and others downstairs talking about him. Irritated, he loaded his rifle and went downstairs to intimidate them, but as Corcoran said later, "It just didn't happen that way." (R. at 1988.) Corcoran killed his brother, his sister's fiancé, and two other men in the ensuing incident.

We affirm the trial court's sentence of death.

### Facts & Procedural History

This case returns to us following a remand. *Corcoran v. State*, 739 N.E.2d 649 (Ind.2000). We directed the trial court to reconsider its earlier sentence and sentencing order.

At trial, the State charged Corcoran with four counts of murder and requested the death penalty. The jury found Corcoran guilty of all four counts and recommended the death penalty. The trial court

imposed it. We found a significant possibility that the trial judge's original sentencing order relied on non-statutory aggravators in imposing the death penalty and remanded for the trial court to redetermine whether to impose death based only on statutory aggravating circumstances. *Corcoran*, 739 N.E.2d at 657.

After re-weighing the aggravating and mitigating circumstances of the quadruple murder, the trial court issued a revised sentencing order and again imposed the death sentence. In response to our remand order, the trial judge stated:

> The Court, having evaluated and balanced all these circumstances, finds that the aggravating circumstances outweigh the mitigating circumstances. The Court again finds that the mental or emotional disturbance suffered by [Corcoran] did not affect his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

> The Court, having considered the jury's recommendation that the death penalty be imposed, now finds that such a sentence is supported by the facts and the evidence, and the character of [Corcoran], and therefore orders that [Corcoran] be executed pursuant to Indiana law . . . .

(Supp. R. at 49.)

Corcoran argues on appeal that the trial court improperly considered non-statutory aggravators and failed to consider all proffered mitigators. (Appellant's Br. at 2–3.) We will also consider Corcoran's final claim from his original direct appeal: whether the death sentence is manifestly unreasonable.[1]

## I. Aggravating & Mitigating Circumstances

Corcoran points to the following portion of the revised sentencing order to support his argument that the trial court again improperly considered non-statutory aggravators:

> The trial Court, in balancing the proved aggravators and mitigators, emphasizes to the Supreme Court that it only relied upon those proven statutory aggravators. The trial Court's remarks at the sentencing hearing, and the language in the original sentencing order explain why such high weight was given to the statutory aggravator of multiple murder, and further support the trial Court's personal conclusion that the sentence is appropriate punishment for this offender and these crimes.

(Supp. R. at 48–49.) He also argues that the revised sentencing order is deficient because the trial court found as proven only four of the ten mitigating circumstances he put forward. (Appellant's Br. at 8–9.)

In *Harrison v. State*, 644 N.E.2d 1243, 1262 (Ind.1995), *after remand*, 659 N.E.2d 480 (Ind.1995), *cert. denied*, 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996), we held that a court must offer a detailed explanation of the factors and the weighing process that lead to a death sentence. For guidance, we set out the following steps:

> The trial court's statement of reasons (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been

---

1. Because we found Corcoran's claim regarding the trial court's consideration of non-statutory aggravators dispositive, we did not reach this issue in his original appeal. *See Corcoran*, 739 N.E.2d at 651, 658 n. 7.

evaluated and balanced in determination of the sentence, and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

*Id.* (citations omitted).

■ When imposing a death sentence, a trial court must limit its consideration of aggravating circumstances to those listed in the death penalty statute, Ind.Code Ann. § 35–50–2–9(b) (West 2000). *Stephenson v. State,* 742 N.E.2d 463, 500 (Ind. 2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 905, 151 L.Ed.2d 874 (2002). To satisfy the specificity requirement of *Harrison,* the sentencing order must "explicitly indicate which mitigating circumstances the trial court found . . . [and] explain the specific facts and reasons that led the court to find the existence of whatever mitigating circumstances it did find." *Holsinger v. State,* 750 N.E.2d 354, 362 (Ind.2001).

■ "We require such specificity in a sentencing order or statement of reasons for imposing a sentence to insure the trial court considered only proper matters when imposing sentence, thus safeguarding against the imposition of sentences which are arbitrary or capricious, and to enable the appellate court to determine the reasonableness of the sentence imposed." *Harrison,* 644 N.E.2d at 1262 (citation omitted).

■ When we remand criminal cases to trial courts for new sentencing orders, a trial court's responsibility is to "produce a new sentencing order that responds to the concerns this Court has raised." *O'Connell v. State,* 742 N.E.2d 943, 952–53 (Ind. 2001). Our sole concern here was the possibility that the trial court relied on non-statutory aggravators, so it fulfilled its responsibility by "issuing a new sentencing order without taking further action." *Id.* at 953.

■ We are now satisfied that the trial court has relied on only aggravators listed in Indiana Code § 35–50–2–9(b). In response to our remand, the trial court stated, "[I]n balancing the proved aggravators and mitigators, [the trial court] emphasizes to the Supreme Court that it only relied upon those proven statutory aggravators." (Supp. R. at 48–49.) There is no lack of clarity in this statement and no plausible reason to believe it untrue.

As for the trial court's consideration of mitigating circumstances, Corcoran proffered ten mitigators, but the court found that he proved only four. (Supp. R. at 47–48.) The Court then stated:

The Court finds that the Defendant has proved the mitigating circumstance that he was under the influence of a mental or emotional disturbance at the time the murders were committed on July 26, 1997. The Court gives this mitigating circumstance medium weight. Dr. Engum's opinion at trial was consistent with the opinions of the Court appointed experts that the Defendant suffered from a personality disorder, either paranoid personality disorder, or schizotypal personality disorder.

The Defendant requests the Court to consider as a further mitigating circumstance the fact he cooperated fully with investigating authorities, reducing the potential for additional harm and furthering the State's case against himself. The Court does believe this to be a mitigating circumstance. The Defendant did in fact cooperate with the police and gave a videotaped confession of his involvement. At no time did he deceive or hinder the investigative process by making false or misleading statements. However, as he was the only adult left alive in the house, it would not have

been difficult for the police to investigate and determine who was responsible. The Court therefore assigns this mitigator a low weight.

The Defendant's eighth mitigator is his lack of a significant criminal history. The Defendant has a 1993 conviction for Criminal Mischief as a Class A Misdemeanor. He has no juvenile adjudications. The Court assigns this mitigator a low weight.

Finally, the Defendant's remorse is advanced as a mitigating circumstance. The Defendant has indicated such remorse in a letter to the Court. The Court assigns this mitigator a low weight.

(Supp. R. at 47–48.)

Corcoran's argument that the trial court did not consider six of the proffered mitigating circumstances is without merit. As the mitigating circumstances were not the focus of our concern, we are not surprised that the trial court's second order analyzed only those aggravating and mitigating circumstances it found pertinent to the task on remand.

The trial judge had in fact analyzed Corcoran's proffered mitigators in the course of its original sentencing. Our review of the record also persuades us that the trial court properly rejected the remaining factors in the original sentencing order. (R. at 2574–78.) Corcoran claimed first that his mental disease affected his capacity to appreciate or conform his conduct. (R. at 2574.) As we discuss in greater detail below, the trial court did not err in rejecting it.

█ In a related vein, Corcoran also asked the court to consider the fact that he shielded his young niece from the bloodshed as a mitigator. (R. at 2575.) But this fact cuts both ways. His actions demonstrate a keen awareness of the events that were to follow, and suggest to us that his capacity to appreciate the criminality of his conduct was not inhibited.

█ Third, Corcoran argues that his mental disease prevented him from competently assisting in his defense, stemming primarily from his refusal of favorable plea recommendations offered by the State. (R. at 2574, 2909.) The State's pleas would have kept Corcoran in jail for life, but Corcoran rejected each. He chose instead to exercise his constitutional right to a jury trial, therefore creating the potential for a lesser sentence, a favorable jury recommendation, or an outright acquittal. Corcoran's choice will not act simultaneously as a mitigator for his benefit.

█ The remaining three factors are also without merit. Corcoran was twenty-two at the time of the murders, and offered his age as a mitigator. (R. at 2575, 2915.) Although chronological age is not the end of the inquiry for young adults, considering both the seriousness of this crime and the fact that Corcoran is well past the age of sixteen where the law requires special treatment, we find no abuse of discretion. *See Monegan v. State,* 756 N.E.2d·499, 504–05 (Ind.2001). The fifth rejected factor was Corcoran's good behavior in jail prior to sentencing. (R. at 2575.) We agree with the trial court that this is expected of persons who are incarcerated. *See Walter v. State,* 727 N.E.2d 443, 448–49 (Ind.2000). Even if it is an appropriate mitigator, its weight is modest and we find no abuse of discretion here either. Finally, Corcoran asserted that his admission of guilt through all phases of the legal process should be a mitigating circumstance. (R. at 2575.) Of course, Corcoran did not admit his guilt in the sense that one does in pleading guilty. Corcoran demanded a jury trial and subjected the victims' families and loved ones to a trial. The trial court did not abuse its

discretion in declining to find this mitigator.

In accordance with our guidance in *Harrison* and *Holsinger*, the trial court explicitly identified the proven mitigating circumstances and listed the specific facts and reasons that led the court to find their existence. The trial court fulfilled its resentencing duties.

## II. The Propriety of the Death Sentence

We also address Corcoran's final argument from his original appeal that his sentence is manifestly unreasonable. (Appellant's Br. at 55.)

Although Article VII, § 4 of the Indiana Constitution authorizes us to review and revise sentences, we will do so only when the sentence is "manifestly unreasonable in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). When reviewing death sentences, this standard stands more as a guidepost for our appellate review than an immovable pillar supporting a sentence decision. *See Spranger v. State*, 498 N.E.2d 931, 947 n. 2 (Ind.1986), *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987).

The nature of the offense is clear; Corcoran and his defense team do not dispute the events. (R. at 1994–95, State's Exh. 77; R. at 2175–76; Appellant's Br. at 55.) On July 26, 1997, Corcoran was lying on his bedroom floor and heard men's voices. He became upset because he thought the men were talking about him and took a semi-automatic rifle downstairs to confront them. In the living room were four men, including Corcoran's brother and future brother-in-law, both of whom lived in the house with Corcoran.

Corcoran shot and killed Jim Corcoran, Scott Turner and Timothy Bricker at close range. The final victim, Doug Stillwell, tried to escape, but Corcoran chased him into the kitchen and shot him in the head.

Despite these uncontested facts, Corcoran argues vehemently that his mental health should be of utmost significance in determining his sentence. Seven qualified doctors analyzed Corcoran, (R. at 2904–08, Def.'s Pre–Sent. Memo. at 20–25), and while they offered varying opinions, (R. at 2907, Def.'s Pre–Sent. Memo. at 20–25), it appears that the consensus was that Corcoran suffered from schizotypal or paranoid personality disorder. (R. at 2306; 2309–10, Def.'s Exh. C; 2904; 2908; Def.'s Pre–Sent. Memo. at 20–25.)

In Corcoran's pre-sentencing memorandum, the defense presented the opinions of two doctors who interviewed Corcoran in 1999, two years after the murders, and diagnosed him as suffering from "schizophrenia, paranoid type." (Def.'s Pre–Sent. Memo. at 23.) Moreover, Dr. Engum, who testified at the penalty phase of the trial, originally opined that Corcoran suffered from schizotypal personality disorder and later changed his opinion, "with [the benefit of] hindsight," to suggest that progression to schizophrenia was "possible." (Def.'s Pre–Sent. Memo. at 22.)

The trial court expressed understandable concern with these diagnoses. Each was performed two years after the murders and with the knowledge of the jury's death sentence recommendation. (R. at 2905–06; Def.'s Pre–Sent. Memo. at 22–25.) As Dr. Engum stated, "[A]n estimated 10 to 20 percent of patients with Schizotypal personality disorder eventually progress to full-blown schizophrenia." (Def.'s Pre–Sent. Memo. at 22.) Whether or not Corcoran had progressed to schizophrenia two years after the crime is immaterial; rather, we are concerned with his mental state at the time of the murders, which consensus says and the trial court

found to be schizotypal personality disorder. (R. at 2904.) Corcoran does not assert on appeal that his subsequent mental illness prevents the imposition of the death penalty.

In addition to monitoring Corcoran's demeanor throughout trial, the court listened to and considered each of the doctor's reports. The trial judge said:

> The Court is not convinced that [Corcoran]'s affliction meets the legal definition of mental disease or defect. The Court notes that even the well respected psychiatrists and psychologists opinions (not only those who examined [Corcoran], but those contained in the literature submitted in the Sentencing Memorandums) can be viewed as ambiguous. The Court notes that all seven (7) Doctors offered differing opinions as to [Corcoran] and Dr. Spink admitted psychiatry is not an exact science and there are no black and white rules. The literature, and Dr. Engum's original opinion consider schizotypal or paranoid personality disorders to be maladaptive lifestyles. The facts reflect that [Corcoran] had the presence of mind to shield his young niece upstairs from the carnage he inflicted on innocent victims downstairs in the house on Bayer Avenue. He knew immediately what he had done, he knew at the time what he was doing, and he knew that what he was doing was wrong.

(R. at 2576.)

The trial judge's consideration of the evidence about Corcoran's mental health reflected a fair amount of care; she concluded that he suffered from schizotypal personality disorder. (R. at 2904, 2907.) In other words, Corcoran was genetically predisposed to be a "loner" or "hermit."

(R. at 2240, 2333.) The professional analysis of Corcoran portrayed him as a person with "social and interpersonal deficits" who experiences "discomfort with, and reduced capacity for close relationships." (R. at 2309, Def.'s Exh. C.)

We are satisfied that the trial court's decision that a quadruple killing was weightier than the proffered mitigation of Corcoran's mental health led the trial court to an appropriate sentence.

### Conclusion

We affirm the sentence of the trial court.

DICKSON, SULLIVAN, and BOEHM, JJ., concur.

RUCKER, J., dissents with separate opinion.

RUCKER, Justice, dissenting.

I respectfully dissent because I do not believe a sentence of death is appropriate for a person suffering a severe mental illness. Recently the Supreme Court held that the executions of mentally retarded criminals are "cruel and unusual punishments" prohibited by the Eighth Amendment of the United States Constitution. *Atkins v. Virginia*, —— U.S. ——, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002). There has been no argument in this case that Corcoran is mentally retarded.[1] However, the underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency.

In that regard I associate myself with the dissenting opinion of Justice Pfeifer of the Ohio Supreme Court who noted:

---

**1.** By statute, Indiana prohibits the execution of the mentally retarded. *See* Ind.Code § 35– 36–9–6.

Mental illness is a medical disease. Every year we learn more about it and the way it manifests itself in the mind of the sufferer. At this time, we do not and cannot know what is going on in the mind of a person with mental illness. As a society, we have always treated those with mental illness differently from those without. In the interest of human dignity, we must continue to do so.... I believe that executing a convict with a severe mental illness is a cruel and unusual punishment.

*Ohio v. Scott,* 92 Ohio St.3d 1, 748 N.E.2d 11, 20 (2001) (Pfeifer, J., dissenting), *cert. denied,* 532 U.S. 1034, 121 S.Ct. 1996, 149 L.Ed.2d 780 (2001). Addressing the federal constitutional claim the Supreme Court noted, "pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally re-tarded is appropriate." *Atkins,* —— U.S. at ——, 122 S.Ct. at 2251. Apart from the federal constitution, Indiana has its own constitutional provision against cruel and unusual punishment.[2] Because Indiana's constitution affords even greater protection than its federal counterpart, I would hold that a seriously mentally ill person is not among those most deserving to be put to death. To do so in my view violates the Cruel and Unusual Punishment provision of the Indiana Constitution. Because Corcoran is obviously severely mentally ill, he should be sentenced to life without the possibility of parole, not death.

---

**2.** *See* Ind. Const. art. I, § 16 (providing "Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense.").