Joseph E. CORCORAN, Appellant (Petitioner below),

v.

STATE of Indiana, Appellee (Defendant below).

No. 02S00–0304–PD–00143.

Supreme Court of Indiana.

Jan. 11, 2005.

Susan K. Carpenter, Public Defender of Indiana, Joanna McFadden, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Stephen R. Creason, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Joseph E. Corcoran, convicted of four murders and sentenced to death, indicated that he believed he should be put to death for his crimes and waived any further legal review of his convictions and sentence.

The State Public Defender took the position that he was not competent to make that decision. The trial court with responsibility for this case found Corcoran to be competent and the State Public Defender appealed that determination. Recently, Corcoran recanted his waiver of further review and now seeks dismissal of this appeal. For the reasons set forth in this opinion, we deny Corcoran's recent request for dismissal and affirm the trial court's determination of competency.

### Background

Corcoran killed his brother, his sister's fiancé, and two other men in an incident at his sister's home. He was convicted of four counts of murder in May, 1999, and sentenced to death. Corcoran sought appellate review only of his death sentence; he did not challenge the convictions.[1] This Court affirmed the sentence. *Corcoran v. State,* 774 N.E.2d 495 (Ind.2002). Corcoran filed a petition seeking rehearing that was denied on March 4, 2003. 2002 WL 31002914, 2003 Ind. Lexis 265 (Ind.2003).

Indiana law provides procedures for individuals sentenced to death to challenge their sentences even after they have been affirmed by the State Supreme Court by means seeking "post-conviction remedies." To avail oneself of these remedies, an individual sentenced to death must comply with certain provisions of the Indiana Rules of Criminal Procedure and Rules of Procedure for Post–Conviction Remedies.

Indiana Criminal Procedure Rule 24(G)(2) provides:

On the thirtieth (30th) day following completion of rehearing, the Supreme Court shall enter an order setting an execution date, unless counsel has appeared and requested a stay in accordance with section (H) of this rule.

Section H provides:

Within thirty (30) days following completion of rehearing, private counsel retained by the inmate or the State Public Defender (by deputy or by special assistant in the event of a conflict of interest) shall enter an appearance in the trial court, advise the trial court of the intent to petition for post-conviction relief, and request the Supreme Court to extend the stay of execution of the death sentence . . . . When the request to extend the stay is received, the Supreme Court will direct the trial court to submit a case management schedule consistent with Ind.Code § 35–50–2–9(i) for approval.

On April 2, 2003, the State Public Defender appeared and requested a stay in accordance with these provisions. This Court granted the request and, pursuant to our order, the trial court submitted a case management schedule requiring a Petition for Post–Conviction Relief to be filed by September 9, 2003.

A Petition for Post–Conviction Relief must be signed by the petitioner. Indiana Post–Conviction Rule 1(3). Corcoran refused to sign a Petition. On September 9, the State Public Defender made two filings of relevance to us here with the trial court that has jurisdiction over this case. First, she filed a Petition for Post–Conviction Relief unsigned by the petitioner. And second, she filed a request to determine Corcoran's competency. The trial court refused to allow the Petition because it was unsigned but did schedule a competency hearing.

---

1. Corcoran, "by counsel and personal affidavit, filed a written waiver of his right to appeal his convictions but retained the right to appeal his sentence." *Corcoran v. State,* 739 N.E.2d 649, 651 n. 2 (Ind.2000).

The trial court held a hearing on Corcoran's competency in October, 2003. In December, 2003, the trial court found Corcoran to be competent to waive further challenges to his sentence and be executed. The State Public Defender then sought our review of the trial court's determination. The State has not disputed that the State Public Defender has standing to appeal the trial court's competency determination, although the State does argue that the lawyers do not have standing to raise any other issues on Corcoran's behalf.[2]

On November 16, 2004, Corcoran filed a request with this Court, accompanied by an affidavit indicating his intention to pursue post-conviction relief after all, asking us to dismiss this appeal of the trial court's competency determination as moot and return this case to that court for post-conviction proceedings.

As discussed *supra*, Corcoran has never filed a petition for post-conviction relief and the time to do so has, as best as we can determine, now passed. *See* Crim. R. 24(H) (petitions for post-conviction relief in capital cases must be filed within 30 days following completion of rehearing).[3] Therefore, the ability of Corcoran to obtain post-conviction review of his convictions or sentence at this point is dependent upon the resolution of issues raised by this appeal. We conclude it is in the best interest of the orderly processing of this litigation for this Court to complete review of the issues raised in this appeal at this time. For this reason, Corcoran's motion to dismiss this appeal is denied.

We proceed to address the issues initially raised in this appeal.

## Discussion

### I

The State Public Defender attacks the trial court's competency determination on three grounds. First, she argues that the trial court applied an improper standard to determine competency. Second, she contends as a factual matter that Corcoran is incompetent to waive post-conviction review under any competency standard this Court might choose to employ. Third, she maintains that as a result of Corcoran's incompetence, he could not knowingly, voluntarily, or intelligently waive his right to post-conviction relief.

### A

The State argues that the proper standard for determining the level of competency necessary for Corcoran to waive his right to post-conviction review was that set forth in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (*per*

---

2. "The State does not challenge the Public Defender's standing to appeal the competency determination. While a challenge that standing is absent may be possible, the State believes that a litigant's competency in a death penalty case must be reviewable. Just as an attorney has standing to question a defendant's competency to stand trial, so too should that attorney have standing to raise the issue on appeal. Indeed, that has long been the practice not only in this State but nationally as well. As such, the State believes that the Public Defender's standing in this case is limited to the competency issue only and all other issues may only be raised by Corcoran. Corcoran has not done so; this Court should decline the Public Defender's invitation to conduct what is essentially the post-conviction review that Corcoran does not want to pursue." Br. of Appellee at 18–19.

3. The determination of the timeliness of a petition for post-conviction relief initially is a matter for the post-conviction court, not this Court. While there may be some basis for Corcoran to proceed notwithstanding the time deadline of Criminal Rule 24(H), it is not apparent to us. Consequently, we proceed on the assumption that a petition for post-conviction relief filed by Corcoran at this point would ultimately be dismissed as not timely under Criminal Rule. 24(H).

*curiam*). In *Dusky,* the Supreme Court held that a defendant is competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and … has a rational as well as factual understanding of the proceedings against him." 362 U.S. at 402, 80 S.Ct. 788. The State relies on this standard in part because it is consistent with Indiana Code section 35–36–3–1, Indiana's statutory trial competency standard.[4]

The State Public Defender argues that the proper competency standard is that announced in *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (*per curiam*). In *Rees,* the Supreme Court held that a capital defendant may withdraw a petition for certiorari only after it is determined whether "he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees,* 384 U.S. at 314, 86 S.Ct. 1505.

We are constrained to say that we find little if any difference between the standards enunciated in *Dusky* and *Rees. See Godinez v. Moran,* 509 U.S. 389, 398 n. 9, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (acknowledging that the difference between the *Dusky* and *Rees* standards is not readily apparent and may only be one of terminology). A number of federal courts that have faced this question have been unable, or felt it unnecessary, to attempt to discern a difference between the two tests. *See Dennis v. Budge,* 378 F.3d 880, 889 (9th Cir.2004) (refusing to resolve whether there is any difference between

the *Rees* and *Dusky* standards because the analytical outcomes under each test would be the same); *Michael v. Horn,* 2004 WL 438678, 2004 U.S. Dist. Lexis 3702 (M.D.Pa.2004) (relying on both the principles of *Rees* and *Dusky* to determine competency to forego a collateral challenge); *Groseclose v. Dutton,* 594 F.Supp. 949, 957 n. 4 (M.D.Tenn.1984) (stating that *Dusky* is analytically equivalent to the *Rees* competency test).

■ Federal courts have been unwilling or unable to distinguish between the *Rees* and *Dusky* standards because both tests "highlight[ ] the constitutional necessity that a criminal defendant understand the proceedings and then be capable of aiding his legal counsel in choosing among legal alternatives." *Groseclose,* 594 F.Supp. at 957 n. 4. Under both standards, the inquiry focuses on the individual's "discrete capacity to understand and make rational decisions concerning the proceedings at issue …." *Mata v. Johnson,* 210 F.3d 324, 329 n. 2 (5th Cir.2000). Further, neither test treats "the presence or absence of mental illness or brain disorder [as] dispositive" proof of incompetence, but balances its presence or absence with other evidence. *Id.* Both tests appear to be equivalent in that each is applied in the same way to determine whether an individual has the capacity to comprehend the legal proceedings with which he or she is confronted and assist his or her counsel in choosing among the various legal alternatives.

For these reasons, we will evaluate the post-conviction court's competency determination under the principles of both standards.

---

4. Indiana Code section 35–36–3–1 reads in relevant part that "[i]f the court finds that the defendant has the ability to understand the proceedings and assist in the preparation of the defendant's defense, the trial shall proceed."

**B**

■ We have previously been required to review a post-conviction court's competency determination in a capital proceeding. *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind.2001).[5] In *Timberlake*, we held that a post-conviction court's competency findings are afforded a high level of deference by a reviewing court. The court's decision will be disturbed only "if the evidence is without conflict and leads only to a conclusion contrary to the result of the post[-]conviction court." *Id.* at 597.

■ The post-conviction court here acknowledged in its written findings that Corcoran suffers from a mental illness. The State also concedes that Corcoran suffers from a mental illness. At the competency hearing, the State Public Defender presented the testimony of three mental health experts,[6] each of whom concluded that Corcoran suffers from paranoid schizophrenia. One of the symptoms of Corcoran's condition, according to the three experts, are recurrent delusions that Department of Correction prison guards are torturing him through the use of an ultrasound machine, causing him substantial pain and uncontrollable twitching.

On the basis of this diagnosis, all three experts concluded Corcoran was unable to make a rational decision concerning the legal proceedings confronting him. Each expert stated that Corcoran's decision to forego post-conviction review of his sentence, thereby hastening his execution, was premised on his desire to be relieved of the pain that he believes he experiences as a result of his delusions. To follow the experts' logic, Corcoran's decision to forego post-conviction review cannot be rational if based upon his delusions, which are irrational.

Corcoran, however, made no statement to any of the experts evaluating him indicating that he wished to end his appeals in order to escape his paranoid delusions.[7] Corcoran's prison medical records and the testimony of each expert indicated that his psychotic symptoms were being controlled through various psychiatric medications. Corcoran himself spoke directly to his reasons for not pursuing post-conviction review and the contention that his delusions were prompting his actions at the post-conviction hearing stating:

> See, I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder. I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder, and I believe that I should be executed since I am guilty of four counts of murder.

5. In *Timberlake*, we stated that any:

> claim of incompetence in a post-conviction proceeding presents two distinct issues: (1) whether [petitioner is] "incompetent," or unable to assist his counsel in the preparation of his case and to understand the nature of the post-conviction proceedings, and (2) whether "competence," as that term is understood in cases addressing a defendant's due process rights at trial, is required in post-conviction proceedings.

753 N.E.2d 591, 600 (Ind.2001).

6. Clinical psychologist, Dr. Robert G. Kaplan, forensic psychiatrist, Dr. George Parker, and clinical neuro-psychologist, Dr. Edmund C. Haskins, each separately examined Corcoran. Each expert reviewed Corcoran's mental health records and conducted interviews with him in coming to their conclusions.

7. Drs. Kaplan's and Haskins's conclusions were derived from letters Corcoran wrote to his attorneys and sister stating his willingness to be put to death to gain a sense of relief from prison life.

(Super. Ct. Hr'g Tr. at 89). Corcoran's explicit denial that his delusions prompted him to waive his right to post-conviction review and his reasoning that his death sentence is commensurate with the crime he committed (the conclusion to which both the original trial court jury and judge came), makes it impossible for this Court to conclude that "the evidence is without conflict and leads only to a conclusion contrary to the result of the post[-]conviction court." *Timberlake*, 753 N.E.2d at 597.

Moreover, there is substantial evidence of record that Corcoran was aware of his legal position and the consequences of his decision to forego any further post-conviction review. When asked whether Corcoran has the capacity to understand his legal position, Dr. George Parker, who evaluated Corcoran in preparation for his post-conviction hearing stated:

He has a very clear awareness of the status of his case. He is aware he has been sentenced to death. He is aware that he is in the appeals process. He has a good memory of the events that have taken place from the time of the offense to the trial, to the sentencing phase, and then through the more extensive appeals phase. He is aware of the attorneys' positions and how, how the attorneys have changed over the course of the trial and then [the] appeals process. So, he has a good understanding of what is at issue.

(Super. Ct. Hr'g Tr. at 48). Dr. Robert Kaplan, who also evaluated Corcoran, testified that Corcoran was aware that by not continuing with post-conviction review that he would be executed.

Corcoran was questioned directly by both the State's attorney and the presiding judge regarding his awareness of the proceedings and his legal position. The State's attorney asked the following questions:

Question: Do you understand that by waiving these appeals, you are going to make that happen (his execution) relatively soon?

Corcoran: Yes, I understand.

Question: Do you understand that this appellate process is the opportunity for you to fight to stay alive?

Corcoran: Yes, I understand.

Question: And you are willing to accept the sentence that was handed down by this Court?

Corcoran: Correct.

(Super. Ct. Hr'g. Tr. at 13).

The post-conviction court then questioned Corcoran with respect to the entire history of his case. Corcoran stated that he was aware that he had been convicted of four capital crimes. He related that he understood the purpose of his initial direct appeal to the Indiana Supreme Court to review his death sentence and that his appeal had been unsuccessful. The judge then asked the following questions in order to ascertain Corcoran's level of awareness of the post-conviction proceedings taking place:

The Court: [Do] you understand that these proceedings are your last attempt to review this case?

Corcoran: Yes, I understand.

The Court: Do you also understand that if the review here, were it necessary up on appeal, is unsuccessful, that you would be executed?

Corcoran: Yes, I understand.

The Court: Has anyone, Mr. Corcoran, forced you to waive your rights to appeal?

Corcoran: No.

The Court: Has anyone threatened you to waive your rights to appeal?

Corcoran: No.

The Court: Did anybody tell you, anybody at all, tell you that you would get more favorable treatment if you waived your right to appeal?

Corcoran: No.

The Court: You understand that the two ladies sitting to your left are appointed by the Court to represent you?

Corcoran: Right, yes.

The Court: Do you trust their judgment?

Corcoran: I disagree with them, but I trust their judgment

The Court: What do you disagree with them about?

Corcoran: They didn't have to call a competency hearing, but they did anyway. I disagree with calling the competency hearing.

The Court: You disagreed with them filing that motion?

Corcoran: Correct.

The Court: And you understand what their (defense attorneys') responsibilities are?

Corcoran: Yes.

The Court: And what [the deputy attorney general's] responsibilities are?

Corcoran: Yes.

The Court: And what my responsibilities are?

Corcoran: Yes.

The Court: And you know what we are doing here today?

Corcoran: Yes.

The Court: What were we doing here today?

Corcoran: Determining my competency whether or not I am able to make a decision or not.

(Super. Ct. Hr'g Tr. at 87–88). Both the State's and post-conviction judge's questioning of Corcoran reaffirm the testimony of Dr. Parker that Corcoran was able to appreciate the gravity of his legal position and the consequences of his choice to waive further post-conviction review. The portions of the record described and set forth *supra* are also sufficient evidence to support the post-conviction court's determination that Corcoran made his choice knowingly, voluntarily, and intelligently.

Corcoran's awareness of his legal position and his ability to formulate a rational justification for forgoing further post-conviction review make him competent to waive such review under either *Rees* or *Dusky*. The evidence supports the trial court's conclusion that Corcoran has both a rational understanding of and can appreciate his legal position. Further, the evidence does not conclusively indicate that Corcoran's decision was not made in a rational manner. Thus, we are unable to conclude that "the evidence as a whole lead[s] unerringly and unmistakably to a decision opposite that reached by the post-conviction court," and so we affirm its competency finding. *Timberlake v. State,* 753 N.E.2d at 597 (*citing Harrison v. State,* 707 N.E.2d 767, 773 (Ind.1999)).

### II

■ In addition to challenging the post-conviction court's competency determination, the State Public Defender raises two additional claims. First, the State Public Defender contends that the Constitution and the Indiana death penalty statute required this Court's "review of issues regarding Corcoran's convictions" even though he affirmatively waived such review. Second, the State Public Defender maintains that it would be unconstitutional to execute "a severely mentally ill person, such as Corcoran."

The State, as noted in footnote 2 *supra* and accompanying text, contends that the

State Public Defender is not entitled to litigate these claims in this proceeding.

We agree with the State on this point. Corcoran himself did not authorize this proceeding within the timeframe required by Criminal Rule 24(H) and without his authority, neither the trial court in this proceeding nor this Court has jurisdiction to review claims for post-conviction relief. *See* P–C R. 1(3) (A petition for post-conviction relief "shall be submitted in a form in substantial compliance with the standard form appended to this rule .... The petition shall be made under oath and the petitioner shall verify the correctness of the petition."). While we recognize and appreciate that the State Public Defender raises these claims in the sincere belief that Corcoran is incompetent and did not knowingly, voluntarily, and intelligently waive his right to post-conviction review, that belief alone is not sufficient to overcome the rule's requirement.

In any event, had we found Corcoran incompetent or otherwise not to have knowingly, voluntarily, and intelligently waived his right to post-conviction review, we in all likelihood would have remanded to the post-conviction court for its review of these claims. But we feel constrained to say that both contentions appear to constitute free-standing claims of error that would not be available for post-conviction review. *Williams v. State*, 808 N.E.2d 652, 659 (Ind.2004) ("If the issue is not raised on direct appeal, a claim of ineffective assistance of trial counsel is properly presented in a post-conviction proceeding, but as a general rule, 'most free-standing claims of error are not available in a postconviction proceeding because of the doctrines of waiver and res judicata.' ") (quoting *Timberlake*, 753 N.E.2d at 597–98).

## III

■ To litigate the post-conviction claims discussed in Part II, Corcoran himself would need to authorize such a proceeding. As discussed in Background, *supra*, Corcoran has recently indicated a desire to do so but it appears to us that the deadline for filing a petition for post-conviction relief has long since passed. *See* Crim. R. 24(H). The procedural posture of Corcoran's case and our precedent in *Judy v. State*, 275 Ind. 145, 416 N.E.2d 95 (1981), cause us to reflect upon whether we should extend to individuals sentenced to death automatic post-conviction review in addition to automatic review on direct appeal.

In *Judy v. State*, the defendant had been convicted of four counts of murder and sentenced to death. *Judy*, 416 N.E.2d at 100. After his conviction and sentencing, Judy requested that he be permitted to waive his appeal. *Id.* We found Judy competent to waive his appeals, but refused to allow him to do so without further review to ensure that his sentence had been imposed fairly.[8] *Id.* at 102. We held that "the death sentence cannot be imposed on anyone in this State until it has been reviewed by this Court and found to comport with the laws of this State and the principles of our state and federal constitutions." *Id.*

In addition to promoting society's interest in certainty that when capital punishment is imposed, it is appropriate in light of the nature of the offense and character of the offender, automatic post-conviction review would assure that issues unavailable or otherwise not raised at trial that

---

8. Thirty-seven of the 38 states that allow the death penalty require appellate review of capital convictions and sentences. *See* U.S. Dep't of Justice, Bureau of Justice Statistics, Bulletin: Capital Punishment 3 (2000).

bear upon the propriety of the sentence would be reviewed. The State Public Defender's request here that we review Corcoran's waiver of review on direct appeal of issues relating to his convictions and the constitutionality of the execution of a severely mentally ill person illustrates this point. While as free-standing claims of error, these contentions would unlikely be available for post-conviction review, they could well form the basis of claims of ineffective assistance of trial or direct appeal counsel. *See generally Woods v. State*, 701 N.E.2d 1208 (Ind.1998) (concluding that collateral review will often be the only means to contest the effectiveness of trial or direct appeal counsel). Automatic post-conviction review would permit adjudication of whether Corcoran was the victim of constitutionally deficient performance by counsel at his trial and during his direct appeal.

On the other hand, post-conviction proceedings differ markedly from direct appeal. They occur after the direct appeal stage when the defendant's and society's interests in prolonging capital litigation weakens. One commentator has formulated this analysis as follows:

A defendant seeking to waive proceedings for the first time at the post-conviction relief stage is more likely to have been appropriately convicted and sentenced than a defendant seeking to waive proceedings at the early stages. Such a defendant has received a full trial, full sentencing hearing and full appellate review. Every stage serves as

a checkpoint, an additional safeguard filtering out the impurities. A defendant is less likely to be wrongfully sentenced to death after each stage. Information is gained at the completion of each stage. Any other conclusion would suggest that each [previous] proceeding serves no valuable purpose and would degrade the entire capital proceeding to nothing more than a random game of chance. Therefore, because each stage reduces the chance that a defendant has been inappropriately sentenced to death, the risk of arbitrary application of the death penalty is much lower at the post-conviction relief stage than at previous stages.

Anthony J. Casey, *Maintaining the Integrity of Death: An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings*, 30 Am. Jour.Crim. L. 75, 103 (2002). We generally agree.

We conclude that, at the post-conviction stage, the interest in achieving finality outweighs the benefits of mandating further review.[9] We decline to extend automatic post-conviction review to capital litigants who do not seek such review within the time limits imposed upon them by the Indiana Rules of Criminal Procedure.

### Conclusion

We affirm the post-conviction court's competency finding with respect to Corcoran's ability to waive further collateral review. We hold that the State Public Defender does not have standing to raise the other claims she presents without Cor-

---

9. In fact, only one state requires collateral review of death sentences. New Jersey prohibits capital defendants from waiving post-conviction review in part because "there are some issues that one simply cannot raise on direct appeal ...." *New Jersey v. Martini*, 677 A.2d 1106, 1110 (N.J.1996). The Supreme Court of New Jersey cites issues such as ineffective-assistance of counsel claims as

"particularly well-suited for post-conviction review." *Martini*, 677 A.2d at 1110. Nevertheless, even the New Jersey Court recognizes the state's "strong interest in achieving finality," *id.*, at this stage in the proceedings and provides a capital defendant who does not desire post-conviction review only an abbreviated hearing schedule. *Id.* at 1113.

coran's consent. And we decline to adopt a policy that would extend automatic post-conviction review to all death sentences.

The parties are entitled to seek rehearing from this decision in accordance with Indiana Appellate Rule 54. In the event rehearing is not sought or denied, this Court shall enter an order on the 30th day following completion of appellate review, *i.e.,* the later to occur of the date of this decision if rehearing is not sought or the date rehearing is denied setting an execution date. *See* Criminal Rule 24(H).

SHEPARD, C.J., and DICKSON and BOEHM, JJ., concur. RUCKER, J., dissents with separate opinion.

RUCKER, Justice, dissenting.

I respectfully dissent because I believe Corcoran is not competent to waive his right of post-conviction review.

At his sentencing hearing several years ago, the trial court found that Corcoran "has proved the mitigating circumstance that he was under the influence of a mental or emotional disturbance at the time the murders were committed on July 26, 1997." *Corcoran v. State,* 774 N.E.2d 495, 499 (Ind.2002). Although this circumstance was assigned little weight, the trial court nonetheless found that "Dr. Engum's opinion at trial was consistent with the opinions of the Court appointed experts that the Defendant suffered from a personality disorder, either paranoid personality disorder, or schizotypal personality disorder." *Id.* It is apparent that since July 1997 Corcoran's mental state has deteriorated significantly. So much so that his personality disorder has now developed into full-blown paranoid schizophrenia. In short, Corcoran is seriously mentally ill. And how does his mental illness manifest itself? Corcoran is under the paranoid delusion that prison guards are torturing him with sound waves. As a result, Cor-

coran wants the State to execute him in order to end the pain. I am not willing to accommodate him.

The majority places great weight on Corcoran's own representation that he is not incompetent and wishes to forgo further judicial review, not because of his paranoid delusions, but rather because he is guilty of murder and should be punished. According to the majority, "Corcoran's awareness of his legal position and his ability to formulate a rational justification for forgoing further post-conviction review make him competent to waive such review ...." Op. at 662.

In *Rees v. Peyton,* the Supreme Court declared that in the context of a party's ability to waive his right to further appeals a court must determine, "whether [the petitioner] has capacity to appreciate his position and make a *rational choice* with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (*per curiam*) (emphasis added). This test is slightly different than the one announced in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (*per curiam*), where the Court considered the standard for determining competency to stand trial. In *Dusky* the Court stated that the "test [for competency] must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* at 402.

In my view, the ability to consult with one's lawyer and to have an understanding of the legal proceedings is not quite the same as the ability to make a rational

decision to forgo additional judicial review. It is not inconceivable that a defendant may have the ability to consult with counsel and have complete understanding of the proceedings against him and yet, because of a mental disease or defect, make an irrational decision regarding the pursuit of further litigation. *See, e.g., Dennis ex rel. Butko v. Budge,* 378 F.3d 880, 888 n. 4 (9th Cir.2004) (maintaining that the proper *Rees* question as applied to a defendant suffering a mental illness but understanding the court proceedings is: "If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a *rational* choice among his options?") (emphasis added) (citing *Rumbaugh v. Procunier,* 753 F.2d 395, 398 (5th Cir.1985)).

In any event, even assuming the two tests are indistinguishable, the fundamental requirement underlying any notion of competency still must be one of rationality. *See, e.g., Matheney v. Anderson,* 377 F.3d 740, 747 (7th Cir.2004) (Under *Dusky,* a defendant may not be tried unless he has "a rational as well as factual understanding of the proceedings against him.") (citations omitted); *Budge,* 378 F.3d at 890 ("The question under *Rees* ... is not whether mental illness substantially affects a decision, but whether a mental disease ... substantially affects the prisoner's capacity to appreciate his options and make a rational choice among them.") (citations omitted); *Wilson v. Lane,* 870 F.2d 1250, 1253 (7th Cir.1989) (Under *Rees,* the question is "whether [the defendant] had the capacity to appreciate his position and make a rational decision ....").

In this case, the three mental health professionals testifying at Corcoran's competency hearing concluded that Corcoran was not competent to make a rational decision concerning his litigation. Their testimony on this point should be given credence. The first mental health professional to testify was Doctor Robert G. Kaplan, a clinical psychologist. After reviewing voluminous documents, including the psychological reports of several other doctors, and after interviewing Corcoran himself for approximately four hours, Dr. Kaplan reached certain conclusions. I recount the following exchange in some detail:

[Defense Counsel] Okay. Do you think Mr. Corcoran has the capacity to appreciate the legal position in any of these things?

[Dr. Kaplan] No.

[Defense Counsel] Why are you saying that?

[Dr. Kaplan] I believe that he is delusional, that there are, that he is suffering from a severe mental illness, paranoid schizophrenia that is causing him to believe things about his situation that has affected his ability to make appropriate decisions regarding his defense and how to proceed.

[Defense Counsel] What is this delusion?

[Dr. Kaplan] He has actually two delusions. The first delusion is that the guards are operating an ultrasound machine that is causing him, his body to twitch and move uncontrollably, that it is causing him pain as well. Um, and he has another delusion in which he believes that he is saying things, um, without, um, knowing what he is saying that is causing other people to, to um, become angry at him, to make fun of him.

(Super. Ct. Hr'g Tr. at 11–12).

. . . .

[Defense Counsel] Okay. Does Mr. Corcoran have the capacity to make a ra-

tional choice with respect to abandoning litigation?

[Dr. Kaplan] No.

[Defense Counsel] Why is that?

[Dr. Kaplan] Again, he has, he has—he has a psychosis which is paranoid schizophrenia that is leading him to believe that, you know, one of the reasons that he wants to die is because he doesn't want to continue with this speech disorder that he really doesn't have. And another reason he wants to die is because he doesn't want to continue to be a victim of the guards' ultrasound machine. And that is a highly bizarre belief that is not likely to be in existence either.

(Super. Ct. Hr'g Tr. at 14).

. . . .

[Defense Counsel] Is Mr. Corcoran suffering from a mental disease, disorder, or defect?

[Dr. Kaplan] He is suffering from a very severe mental disease and defect.

[Defense counsel] What mental disease is that?

[Dr. Kaplan] Paranoid schizophrenia.

[Defense Counsel] Does that mental disease affect his capacity to make a rational choice in abandoning this litigation?

[Dr. Kaplan] Could you repeat the question?

[Defense Counsel] Does his paranoid schizophrenia affect his capacity to make a rational choice to abandon further litigation?

[Dr. Kaplan] Yes.

[Defense Counsel] At the risk of being repetitive, how, how does his paranoid schizophrenia affect his rational choice?

[Dr. Kaplan] His paranoid schizophrenia is creating a reality in his mind that doesn't exist, and on the basis of the reality that doesn't exist, he is making the decision about whether he wishes to proceed with his defense against the death penalty or not. In addition to that, the paranoid schizophrenia is also affecting his ability to think logically.

(Super. Ct. Hr'g Tr. at 16–17).

. . . .

[Defense Counsel] So, is [Mr. Corcoran], um, pretending to be mentally ill?

[Dr. Kaplan] No. I, I also administered tests of malingering, psychological tests of malingering. And they clearly showed he was not malingering any mental disorder. Again, if anything, they showed that he was trying to cover up his psychological symptoms and tried to look better than he really was.

(Super. Ct. Hr'g Tr. at 28).

The defense also called to the stand Doctor George Parker, a forensic psychiatrist at the Indiana University School of Medicine. Like Dr. Kaplan, Dr. Parker examined numerous documents containing the evaluations of other mental health professionals and conducted clinical interviews with Corcoran on two separate occasions. His testimony was consistent with that of Dr. Kaplan.

[Defense Counsel] Does [Mr. Corcoran] have a mental disease that affects his capacity to make rational choices to abandon further litigation?

[Dr. Parker] Absolutely.

[Defense Counsel] And how?

[Dr. Kaplan] His diagnosis is schizophrenia, and the symptoms that lead to that diagnosis have a direct bearing on his thought process and why he believes that his execution would be, as he says, a blessed relief. The daily torment of his symptoms of psychosis, his lack of understanding of the emotional conse-

quence to that decision make that a very irrational thought process.

(Super. Ct. Hr'g Tr. at 55–56).

With respect to whether Corcoran may appear to be normal, lucid and in control of his faculties, the following exchange is instructive.

[Dr. Parker] Um, so, he does his best to minimize the severity of his symptoms, to downplay that he might have any mental disorder. That has been a consistent theme throughout this process.... Um, he has a real desire to appear bad rather than mad. So, he wants to be—it is better for him psychologically to appear that he is criminally responsible, than to admit that he has a serious mental illness that may have contributed to his behavior in the past. It speaks to how powerful the stigma is against serious mental illness, that he would rather be executed than admit that schizophrenia might be contributing to his desire to die.

[Defense Counsel] When someone is trying to appear normal or more normal or bad, I mean, would you need to spend more time with that person in order to come across these delusions?

[Dr. Parker] Well certainly, I think Mr. Corcoran did, if you did a brief interview of him, might be able to convince someone things are actually okay. He presents that way. He is very calm. He is organized in his thought process. He is not stupid. He is a bright man. He knows a lot of things. He speaks well for himself. Um, but just because he speaks well and in an organized way and understands sort of the nature of what is going on, the proceedings that are going against him, doesn't mean that he has got an understanding at its foundation that is logical. And the more time you spent with him, the more time you begin to understand how his thought process

is a little bit skewed. And, in fact, the deeper you go, the more skewed it appears. And you can begin to understand how he might feel that execution might be preferable to life as he currently experiences in [sic].

(Super. Ct. Hr'g Tr. at 56–57).

Finally, defense counsel called to the stand Doctor Edmund Haskins, a clinical neuropsychologist. Similar to the approach of the other two testifying doctors, Dr. Haskins also examined Corcoran's voluminous medical records and conducted a clinical interview, which lasted two to three hours, a few weeks before the hearing. Portions of Dr. Haskins' testimony follow.

[Defense Counsel] Okay. Does Joe—Mr. Corcoran have a capacity to make a rational choice with respect to abandoning his litigation?

[Dr. Haskins] I don't believe so.

[Defense Counsel] And why?

[Dr. Haskins] The reason is, that in order to make a rational decision, one has to adequately hold in mind the available options one is considering. You have to consider the options. You have to make reasoned judgments, weighing the pros and cons of both options or whatever the options happen to be. In Mr. Corcoran's case, in the context of this particular decision about, um, waiving his right to post-conviction review, I believe that his psychoses do not permit him to reason and make a reasoned decision in that way. I have to perhaps add that in reviewing the results of the neuropsychological testing that was done with Mr. Engum back with, Dr. Engum back in 1999, clearly, he did very well on that testing. His ability to perform on tests of memory, tests of attention and concentration, even tests of reasoning, was intact at that time.

Um, but that is not really the issue that we are dealing with here. We are dealing with his ability to make a reasoned decision in this particular case. In the context of a neuropsychological evaluation, um, when doing puzzles or doing other kinds of, of nonemotional [sic] tasks, um, academic intellectual type tasks, he can do very well with that. He is a very bright man. He has good cognitive ability.

Unfortunately, his paranoid schizophrenia, however, is preventing him from being able to put that to use in this particular case. So, rather than being able to consider all the options and weigh all of the alternatives, he is choosing only that alternative which will most inexorably lead to his own death, and he is doing that on the basis of this paranoid delusion that he is being persecuted and tormented.

(Super. Ct. Hr'g Tr. at 66–67). Each of the three mental health professionals testifying at Corcoran's competency hearing explained that Corcoran's individual thought processes have been affected by his mental illness. Such competency determinations involve a thorough assessment of a person's mental capabilities, taking into account the impact that mental illness has on those capabilities.

I acknowledge that the existence of delusions and a diagnosis of paranoid schizophrenia do not necessarily preclude rational decision-making and competence. However, all three experts unanimously concluded that Corcoran's decision to welcome and hasten his own death is based on his delusional perception of reality and has no basis in rational thought whatsoever. The majority as well as the trial court dismiss the mental health experts' conclusions on the basis of Corcoran's own representation that his decision to die is based upon the fact that he murdered four

people and therefore deserves the ultimate sanction. However, as Dr. Parker explained:

> [I]t is better for him [Corcoran] psychologically to appear that he is criminally responsible, than to admit that he has a serious mental illness that may have contributed to his behavior in the past. It speaks to how powerful the stigma is against serious mental illness, that he would rather be executed that admit that schizophrenia might be contributing to his desire to die.

(Super. Ct. Hr'g Tr. at 56–57). Obviously, Corcoran is a man of considerable intelligence and expressive powers. But the fact that he offers what otherwise might be considered a rational explanation for his decision to die is itself intricately related to his mental illness.

Although I remain opposed to the execution of the seriously mentally ill, *see Corcoran*, 774 N.E.2d at 502 (Rucker, J., dissenting), that is not the precise issue before us today. Rather, defense counsel merely seeks the opportunity to pursue post-conviction relief on Corcoran's behalf. The uncontroverted evidence that Corcoran is a delusional paranoid schizophrenic is, in my view, insufficient to support a finding of competence as contemplated by the test articulated in either *Rees* or *Dusky*. Thus, I am of the view that Corcoran is in no position to waive his right of post-conviction relief and that this cause should be remanded to the post-conviction court for its review of the claims counsel makes on Corcoran's behalf.