

FILED

Dec 10 2024, 11:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Indiana Supreme Court

Supreme Court Case Nos. 24S-SD-222, 02S00-0508-PD-350

## Joseph E. Corcoran,
*Petitioner,*

–v–

## State of Indiana,
*Respondent.*

---

Decided: December 10, 2024

On Successive Petitions for Post-Conviction Relief
and Motions to Stay in a Capital Case

Direct Appeal from the Allen Superior Court,
Case No. 02D04-9707-CF-465

---

**Opinion by Justice Molter**

Justices Massa and Slaughter concur.
Justice Goff dissents with separate opinion in which Chief Justice Rush joins.

**Molter, Justice.**

A quarter century ago, an Allen County jury convicted Joseph Corcoran of a quadruple murder, and the judge sentenced him to death as the jury recommended. Since then, courts at every level of the state and federal judiciary have been litigating whether the state and federal constitutions prohibit Indiana from executing him. That litigation has included multiple decisions from courts of last resort—five opinions from our Court and two opinions from the United States Supreme Court. After both judiciaries resolved all the issues before them, we set an execution date of December 18, 2024.

At this point, Corcoran doesn't want to petition the courts to challenge his execution. He recently wrote to us: "I am guilty of the crime I was convicted of, and accept the findings of all the appellate courts." Affidavit at 2. He says "[t]he long drawn out appeal history has addressed all the issues [he] wished to appeal, such as the issue of competency." *Id.* And, therefore, he does "not wish to proceed with more and/or endless litigation." *Id.* He confirms that he understands he "will then be put to death for the heinous crime [he] committed," and that his execution "serves as both a punishment and a deterrent." *Id.*

Contrary to Corcoran's wishes, the State Public Defender filed two motions for permission to file two separate successive petitions for post-conviction relief and two accompanying motions to stay the execution while those petitions are litigated. Those submissions argue that Corcoran's mental illness precludes his execution. But we can only disregard Corcoran's decision to waive post-conviction remedies if he isn't competent to make that decision, and our Court previously concluded that he is. The State Public Defender again questions Corcoran's competency to waive post-conviction remedies, but she relies on the same evidence we considered the last time, and the minimal new evidence she identifies is offered only to confirm that Corcoran's condition is unchanged. Since Corcoran does not authorize the successive petitions on his behalf, we cannot authorize them either.

Even setting aside the fact that Corcoran has not authorized the requests for successive petitions, we still must deny the motions because

there is no reasonable possibility that Corcoran is entitled to relief. The State Public Defender has standing only to challenge Corcoran's competency to waive post-conviction remedies, and the remaining claims in the first petition are procedurally defaulted anyway. The second petition argues that Corcoran is not competent to be executed because he does not have a rational understanding of why the State will execute him. But we previously concluded he does; ample evidence, including his recent affidavit, further illustrates that; and the State Public Defender has not made the threshold substantial showing that anything has changed.

We therefore agree with the State that we must deny all four of the State Public Defender's motions.

# Facts and Procedural History

## I.   Prior State Court Proceedings

### A.   Corcoran's Direct Appeal

Just over twenty-five years ago, an Allen County jury convicted Joseph Corcoran of four murders. He had been "under stress because his sister's upcoming marriage would necessitate his moving out of her house," and "his brother said Corcoran could not move in with him." *Corcoran v. State*, 774 N.E.2d 495, 497 (Ind. 2002). When he "awoke one afternoon to hear his brother and others downstairs talking about him," "he loaded his rifle and went downstairs to intimidate them, but as Corcoran said later, 'It just didn't happen that way.'" *Id.* Instead, "Corcoran killed his brother, his sister's fiancé, and two other men in the ensuing incident." *Id.*

That same jury also recommended that Corcoran be sentenced to death for the four murders, and the trial judge imposed that sentence. When imposing the sentence, "the trial judge thoughtfully considered the nine mitigating circumstances asserted by the defendant," agreeing with many, including that "the defendant was under the influence of a mental or emotional disturbance at the time the murders were committed." *Corcoran*

*v. State*, 739 N.E.2d 649, 656 (Ind. 2000). But the judge gave each of the mitigating factors "medium or low weight," and she believed the aggravating circumstances—multiple murders—outweighed the mitigating circumstances. *Id.*

Corcoran didn't appeal his conviction, but he appealed his sentence, raising eight claims: four independent arguments that Indiana's death penalty statute violated the state and federal constitutions; an argument that the prosecutor committed misconduct in the penalty phase closing argument; an argument that the death penalty statute was ambiguous and had to be construed against the State; an argument that the judge improperly considered a non-statutory aggravator when sentencing; and an argument that the death sentence in this case is manifestly unreasonable. *Id.* at 651.

Our Court considered those arguments and unanimously rejected all but one; we agreed with Corcoran that the judge may have considered non-statutory factors when imposing a death sentence because she noted his future dangerousness to the community, the innocence of the victims, and the heinousness of the crime. *Id.* at 657. We remanded for resentencing based on the evidence already presented. *Id.* Chief Justice Shepard concurred with a separate opinion explaining that he agreed with the remand "largely because meticulous attention to capital cases at an early stage saves a good deal of effort later on." *Id.* at 658 (Shepard, C.J., concurring). He read the trial judge's sentencing statement as simply elaborating on the statutory factor for committing multiple murders, and he would have been willing to affirm on that basis. *Id.* But he nevertheless agreed it was "worth clarifying now that only statutory aggravating circumstances are being considered." *Id.*

On remand, the trial court reimposed the death sentence after again assigning "medium weight" to "the mitigating circumstance that [Corcoran] was under the influence of a mental or emotional disturbance at the time the murders were committed." *State v. Corcoran*, No. 02D04-9707-CF-465, 2001 WL 36099910 (Allen Superior Ct. Sept. 30, 2001). It based that conclusion on the opinions of court-appointed experts "that the Defendant suffered from a personality disorder, either paranoid

personality disorder, or schizotypal personality disorder." *Id.* Corcoran again appealed, and our Court affirmed in a 4-1 decision. *Corcoran*, 774 N.E.2d at 499. The majority rejected Corcoran's arguments that the trial judge again considered non-statutory aggravators, that the judge failed to consider all proffered mitigators, and that the sentence was manifestly unreasonable. *Id.* at 499, 500, 502.

As for the reasonableness of the sentence, Corcoran "argue[d] vehemently that his mental health should be of utmost significance in determining his sentence." *Id.* at 501. Our Court acknowledged that "[s]even qualified doctors analyzed Corcoran, and while they offered varying opinions," it seemed "the consensus was that Corcoran suffered from schizotypal or paranoid personality disorder." *Id.* (citations omitted). But after carefully reviewing the evidence, our Court was "satisfied that the trial court's decision that a quadruple killing was weightier than the proffered mitigation of Corcoran's mental health led the trial court to an appropriate sentence." *Id.* at 502.

Justice Rucker dissented because, like the attorneys arguing before us now, he did not "believe a sentence of death is appropriate for a person suffering a severe mental illness." *Id.* (Rucker, J., dissenting). As the attorneys now argue again, he thought the Eighth Amendment's ban on "cruel and unusual" punishment forecloses executing mentally ill prisoners like Corcoran for the same reasons the United States Supreme Court has said the Eighth Amendment prohibits executing the intellectually disabled. Even if the federal constitution didn't prohibit Corcoran's execution, he concluded—like the attorneys here argue—that Indiana's Constitution did. *Id.* at 503 ("Because Indiana's constitution affords even greater protection than its federal counterpart, I would hold that a seriously mentally ill person is not among those most deserving to be put to death. To do so in my view violates the Cruel and Unusual Punishment provision of the Indiana Constitution."). Corcoran requested rehearing, but we denied that request.

## B. State Court Proceedings to Determine Corcoran's Competency to Waive Post-Conviction Remedies

Our rules permitted Corcoran to again challenge his sentence through procedures for post-conviction remedies, but he elected not to. *Corcoran v. State*, 820 N.E.2d 655, 656 (Ind. 2005), *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005). However, the State Public Defender believed Corcoran was incompetent to make that decision given his mental illness, so she requested competency proceedings. *Id.* at 657. The trial court held a hearing, and the State Public Defender offered "the testimony of three mental health experts, each of whom concluded that Corcoran suffers from paranoid schizophrenia." *Id.* at 660 (footnote omitted).

They all said that symptomatic of Corcoran's condition was that he had "recurrent delusions that Department of Correction prison guards are torturing him through the use of an ultrasound machine, causing him substantial pain and uncontrollable twitching." *Id.* Based on their diagnosis, "all three experts concluded Corcoran was unable to make a rational decision concerning the legal proceedings confronting him." *Id.* They thought "Corcoran's decision to forgo post-conviction review of his sentence, thereby hastening his execution, was premised on his desire to be relieved of the pain that he believes he experiences as a result of his delusions." *Id.* In essence, they reasoned that "Corcoran's decision to forgo post-conviction review cannot be rational if based upon his delusions, which are irrational." *Id.*

As in the affidavit Corcoran recently submitted to our Court, in those earlier proceedings he "spoke directly to his reasons for not pursuing post-conviction review and the contention that his delusions were prompting his actions." *Id.* Just as he says now, he said then:

> See, I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder. I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder, and I

believe that I should be executed since I am guilty of four counts of murder.

*Id.* Dr. George Parker, after evaluating Corcoran for the competency hearing, explained:

He has a very clear awareness of the status of his case. He is aware he has been sentenced to death. He is aware that he is in the appeals process. He has a good memory of the events that have taken place from the time of the offense to the trial, to the sentencing phase, and then through the more extensive appeals phase. He is aware of the attorneys' positions and how, how the attorneys have changed over the course of the trial and then [the] appeals process. So, he has a good understanding of what is at issue.

*Id.* at 661.

That was consistent with Dr. Robert Kaplan's testimony, after evaluating Corcoran, "that Corcoran was aware that by not continuing with post-conviction review that he would be executed." *Id.* Both the State's attorney and the presiding judge questioned Corcoran further and confirmed his understanding of the legal proceedings and his legal position. *Id.* That included the judge questioning "Corcoran with respect to the entire history of his case," and Corcoran's answers reflecting that "he was aware that he had been convicted of four capital crimes"; that "he understood the purpose of his initial direct appeal to the Indiana Supreme Court to review his death sentence and that his appeal had been unsuccessful"; and that the post-conviction proceedings were his "last attempt to review [the] case." *Id.* He confirmed that he had court-appointed counsel whose judgment he trusted with one exception; he disagreed with them challenging his competency to waive post-conviction review. *Id.* at 662.

After an extensive review of the record, our Court concluded that "[b]oth the State's and post-conviction judge's questioning of Corcoran reaffirm the testimony of Dr. Parker that Corcoran was able to appreciate

the gravity of his legal position and the consequences of his choice to waive further post-conviction review." *Id.* And other portions of the record were "also sufficient evidence to support the post-conviction court's determination that Corcoran made his choice knowingly, voluntarily, and intelligently." *Id.* We explained:

> Corcoran's explicit denial that his delusions prompted him to waive his right to post-conviction review and his reasoning that his death sentence is commensurate with the crime he committed (the conclusion to which both the original trial court jury and judge came), makes it impossible for this Court to conclude that the evidence is without conflict and leads only to a conclusion contrary to the result of the post-conviction court.

*Id.* at 661 (brackets and quotations omitted).

The State Public Defender also raised two additional claims: (1) "the Constitution and the Indiana death penalty statute required this Court's review of issues regarding Corcoran's convictions even though he affirmatively waived such review"; and (2) "it would be unconstitutional to execute a severely mentally ill person, such as Corcoran." *Id.* at 662 (quotations omitted). We rejected those claims because Corcoran did not authorize the State Public Defender to make them, "and without his authority, neither the trial court in this proceeding nor this Court has jurisdiction to review claims for post-conviction relief." *Id.* at 663. We noted our acknowledgment and appreciation "that the State Public Defender raises these claims in the sincere belief that Corcoran is incompetent and did not knowingly, voluntarily, and intelligently waive his right to post-conviction review," but "that belief alone is not sufficient to overcome the rule's requirement" that Corcoran authorize the claim. *Id.* We also noted that the claims were likely to fail anyway because "both contentions appear to constitute free-standing claims of error that would not be available for post-conviction review." *Id.*

Justice Rucker again dissented. Like the State Public Defender argues here, Justice Rucker disagreed with the weight the majority placed on Corcoran's explanations of his understanding of his rights and the

proceedings and instead gave greater weight to the testimony of the three mental health experts who concluded Corcoran was not competent. *Id.* at 666 (Rucker, J., dissenting). Justice Rucker acknowledged "that the existence of delusions and a diagnosis of paranoid schizophrenia do not necessarily preclude rational decision-making and competence." *Id.* at 669. But he believed there was more credence to the experts' conclusion "that Corcoran's decision to welcome and hasten his own death is based on his delusional perception of reality and has no basis in rational thought whatsoever." *Id.*

We affirmed our judgment on rehearing with a published opinion. *Corcoran v. State*, 827 N.E.2d 542, 546 (Ind. 2005).

### C. Corcoran's Untimely Petition for Post-Conviction Relief

While the appeal of Corcoran's competency proceedings was pending, he changed his mind and decided to pursue post-conviction relief. He then filed a petition for post-conviction relief reflecting his authorization, but that was after the deadline, so the post-conviction court dismissed his petition, and we affirmed. *Corcoran v. State*, 845 N.E.2d 1019, 1020 (Ind. 2006). Only Justice Rucker dissented, this time without a separate opinion. Our Court's majority opinion emphasized that by that point, we had "afforded Corcoran considerable review of his sentence[] and the post-conviction court's competency determination." *Id.* (citations omitted). And "[t]he public interest in achieving finality at [that] stage weigh[ed] heavily against further review." *Id.* at 1023.

## II. Federal Court Proceedings

### A. District Court Habeas Proceedings

Following those first six years of post-conviction litigation, review of Corcoran's conviction and sentence moved to the federal courts when he filed a habeas corpus petition under 28 U.S.C. § 2254 in the Northern

District of Indiana. The court began by noting the "unusual and more convoluted than normal" procedural history. *Corcoran v. Buss*, 483 F. Supp. 2d 709, 712 (N.D. Ind. 2007), *rev'd*, 551 F.3d 703 (7th Cir. 2008), *cert. granted, judgment vacated sub nom. Corcoran v. Levenhagen*, 558 U.S. 1, 130 S. Ct. 8, 175 L. Ed. 2d 1 (2009), *and opinion reinstated sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011), *and aff'd as modified sub nom. Corcoran v. Levenhagen*, 593 F.3d 547 (7th Cir. 2010), *as amended on denial of reh'g and reh'g en banc* (Apr. 14, 2010), *and aff'd in part, rev'd in part sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011). As the citation for that statement foreshadows, the procedural history only got more convoluted from there.

Turning to the claims, the district court felt "compelled to note at this point that this habeas corpus petition is seriously untimely," but it did not dismiss because the respondent had not requested dismissal on that basis. *Id.* at 716, 718. It then granted the petition in part. It agreed with Corcoran that the State's pretrial offer (which he rejected) to waive the death penalty in exchange for Corcoran agreeing to a bench trial violated his Sixth Amendment right to a jury trial, and the court ordered the case remanded for resentencing without the option of reimposing the death penalty. *Id.* at 725–26.

Given this holding, the court declined to address the remaining claims that the trial judge made errors in the sentencing, that Indiana's death penalty statute was unconstitutional, that there was prosecutorial misconduct during the penalty phase, and that Corcoran was incompetent to be executed. *Id.* The court rejected the argument that Corcoran was not competent to stand trial or waive his direct appeal because those claims were procedurally defaulted. *Id.* at 728–29.

Corcoran's counsel also challenged our Court's conclusion that he was competent to waive post-conviction proceedings, and after reviewing the record, the district court concluded our determination was "neither an unreasonable application of United State[s'] Supreme Court law nor an unreasonable determination of the facts." *Id.* at 733. The district court noted that "[t]he state courts acknowledged that the petitioner suffers from a mental illness and fully confronted this question," but "[i]n the end they determined that his mental illness did not substantially affect his

capacity to appreciate his position as a death row inmate and that he understood how and why he was there." *Id.* And "[n]either did his mental illness impact his understanding of his legal position *vis-à-vis* his appeals." *Id.* The court explained that while "philosophically one can question whether it can ever be a rational choice to abandon appeals which are the only means to avoid the death penalty, legally even [United States Supreme Court precedent] leaves no doubt that it is possible to do so." *Id.* So, "[f]rom a legal perspective, the state court's determination that the petitioner made a rational choice [w]as not unreasonable." *Id.* It concluded that on this issue, "[t]he opinion of the Supreme Court of Indiana, as presented above, is thorough, thoughtful, and reasonable," so "no relief can be granted on this ground." *Id.* at 733–34.

## B.  First Seventh Circuit Appeal

The respondent appealed, and the Seventh Circuit reversed the district court's decision granting partial habeas relief and affirmed the district court's decision regarding competency. *Corcoran v. Buss*, 551 F.3d 703, 704 (7th Cir. 2008), *cert. granted, judgment vacated sub nom. Corcoran v. Levenhagen*, 558 U.S. 1, 130 S. Ct. 8, 175 L. Ed. 2d 1 (2009), *and opinion reinstated sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011). As for our Court's conclusion that the State's offer not to pursue the death penalty in exchange for Corcoran waiving a jury trial did not violate his constitutional rights, the federal appellate court concluded our decision "was neither incorrect nor unreasonable to warrant the district court's grant of [Corcoran's] habeas petition." *Id.* at 712.

Corcoran cross-appealed the district court's holding that he was competent to waive post-conviction proceedings. But the Seventh Circuit affirmed, observing that our Court "gave careful consideration of all the evidence presented at the post-conviction hearing." *Id.* at 713. The court recounted our acknowledgment "that the experts testified that Corcoran suffered from paranoid schizophrenia and his resulting delusions caused him to waive further review of his sentence, but [we] also found that Corcoran had a clear awareness of the status of his case and what was at risk if he waived further review." *Id.* And we considered "Corcoran's own

conduct and testimony at the hearing, in which he stated that his decision to waive further proceedings was based on his remorse for his crime, and not on any 'delusions' he was said to have been experiencing." *Id.* In the end, while "experts believed otherwise, the Indiana Supreme Court was entitled to accept Corcoran's contention that his request to waive further proceedings was based on his belief that death is a just punishment for his crimes." *Id.*

The court also noted our repeated conclusions that a defendant's acceptance of the death penalty is not necessarily irrational. *Id.* at 714 (citing *Smith v. State,* 686 N.E.2d 1264, 1273 (Ind. 1997) (considering a defendant's preference for death over life imprisonment, where there was an indication of his desire not to spend the rest of his life in prison, and concluding that to do so is not "per se irrational"). And it noted it had reached that conclusion in the past too. *Id.* (citing *Wilson v. Lane,* 870 F.2d 1250, 1254 (7th Cir. 1989) (affirming a district court's finding of a death row inmate's competency to waive further appeals even though the inmate was ruled mentally incompetent after considering the inmate's unwavering testimony that he was aware of his position and of the federal review options available to him, and that he based his decision not on the conditions of his confinement, but on his belief that death was a better option than life in prison)).

The court further found "no support for Corcoran's contention that a petitioner who has been diagnosed with a mental illness is not competent to waive post-trial proceedings." *Id.* As it explained, the question "is whether a mental illness substantially affects the capacity to appreciate his options and make a rational choice among them." *Id.* The Seventh Circuit's "review of the transcripts and the evidence before the Indiana Supreme Court reveals that it (as well as the two other courts that considered Corcoran's competency) thoroughly and conscientiously examined Corcoran's claims of incompetency, and its findings that he had a 'rational understanding of and [could] appreciate his legal position' are factually supported by the record." *Id.* The court remanded with instructions to deny habeas relief, leaving Indiana at liberty to reinstate the death sentence. *Id.*

Judge Williams dissented in part, disagreeing with the majority on the competence issue. She saw the issue like Justice Rucker did. She explained that "[n]o one contests that Corcoran suffers from a mental illness," and that "is clear from his delusion that prison guards torture him daily with an ultrasound machine, his conversations with individuals who are not there, and his delusion that he suffers from an involuntary speech disorder." *Id.* at 714–15 (Williams, J., concurring in part and dissenting in part). Like Justice Rucker, Judge Williams placed great weight on the fact that "[t]he three experts who testified in the competency hearing unanimously concluded that Corcoran suffers from paranoid schizophrenia that renders waiver of further appeal of his death sentence impossible because the illness prevents him from making rational decisions." *Id.* at 715. Judge Williams didn't believe the record supported some of our Court's factual statements, and she faulted the Court for failing "to consider Corcoran's testimony in light of his delusions." *Id.* at 716.

## C.   First United States Supreme Court Review

The United States Supreme Court then granted certiorari and vacated the Seventh Circuit's decision in a *per curiam* opinion. *Corcoran v. Levenhagen*, 558 U.S. 1, 3 (2009). It did not quarrel with the analysis of the Seventh Circuit panel majority for the issues the panel considered, but Corcoran had raised other issues too. So the Supreme Court remanded for the Seventh Circuit either to consider the four other grounds for habeas relief that Corcoran raised or to explain why consideration of those issues was unnecessary. *Id.* at 2.

## D.   Seventh Circuit Remand

On remand, the Seventh Circuit concluded that "all of Corcoran's remaining habeas challenges are waived, and that three of them are frivolous, but that one of the challenges nevertheless entitles him to a new sentencing hearing." *Corcoran v. Levenhagen*, 593 F.3d 547, 549 (7th Cir.), *as amended on denial of reh'g and reh'g en banc* (Apr. 14, 2010), *cert. granted, judgment vacated sub nom. Wilson v. Corcoran*, 562 U.S. 1, 131 S. Ct. 13, 178 L.

Ed. 2d 276 (2010). That one issue was that the Seventh Circuit agreed with Corcoran that the trial judge again relied on a non-statutory aggravator when reimposing the death sentence because she said that her statements about Corcoran's future dangerousness, the victims' innocence, and the heinousness of the murders were part of the explanation for the weight she gave to the statutory factor for multiple murders. *Id.* at 551. And, the Seventh Circuit explained, "factor weighting is part of factor 'balancing', the very process in which the trial court disclaimed reliance on non-statutory aggravators." *Id.*

### E.   Second U.S. Supreme Court Review

The case then returned to the United States Supreme Court, and it again issued a *per curiam* opinion reversing the Seventh Circuit. *Wilson v. Corcoran*, 562 U.S. 1, 2 (2010). It explained that "[f]ederal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law." *Id.* The panel's discussion of the sentencing factors addressed a matter of state law, and "the panel's opinion contained no hint that it thought the violation of Indiana law it had unearthed also entailed the infringement of any federal right." *Id.* at 5.

### F.   Second Seventh Circuit Remand

On remand to the Seventh Circuit, the federal appellate court concluded that "[i]n hindsight [it] should have returned the case to the district court after the first remand from the Supreme Court," which it went ahead and did on the second remand. *Corcoran v. Wilson*, 651 F.3d 611, 613 (7th Cir. 2011). It noted, "however, that neither of the Supreme Court's decisions casts doubt on [the Seventh Circuit's] resolution of the issues raised in the initial appeal, in which [the court] found no basis for habeas relief on the claimed Sixth Amendment violation or on the issue of Corcoran's competency to waive post-conviction remedies." *Id.* The court therefore reinstated and incorporated by reference its earlier opinion in *Corcoran v. Buss*, 551 F.3d 703, "to the extent that it (1) reversed the district court's judgment granting habeas relief on the basis of the claimed Sixth Amendment violation; and (2) affirmed the district court's conclusion that

the Indiana courts did not mishandle the issue of Corcoran's competence to waive post-conviction remedies." *Corcoran*, 651 F.3d at 613. The court also reinstated Judge Williams' dissent on the competency issue. *Id.* at 613–614. And it remanded to the district court to permit it to address Corcoran's remaining grounds for habeas relief. *Id.* at 614.

## G. District Court Remand

On remand, the district court considered the remaining habeas claims. While the habeas petition initially argued eight grounds for relief, only two remained contested. *Corcoran v. Buss*, No. 3:05-CV-389, 2013 WL 140378, at *1 (N.D. Ind. Jan. 10, 2013), *aff'd sub nom. Corcoran v. Neal*, 783 F.3d 676 (7th Cir. 2015). Corcoran's counsel claimed "that in imposing the death penalty the trial court improperly considered non-statutory aggravating circumstances and failed to consider mitigating evidence, all in violation of the petitioner's constitutional rights as secured by the Eighth and Fourteenth Amendments." *Id.* They also claimed "that Indiana's Death Penalty Statute is facially unconstitutional because it does not distinguish between circumstances that warrant a sentence of death and circumstances that warrant a sentence of life imprisonment without parole." *Id.* The district court rejected both claims, explaining that "[b]oth claims were adjudicated on the merits by the Indiana Supreme Court, which ruled in favor of the State," and counsel had not demonstrated error as required by 28 U.S.C. § 2254(d). *Id.*

## H. Second Seventh Circuit Appeal

Corcoran again appealed to the Seventh Circuit, which affirmed. *Corcoran v. Neal*, 783 F.3d 676, 677 (7th Cir. 2015). The court explained that its earlier opinion disagreed with our Court's assessment that the trial judge did not in fact rely on nonstatutory aggravating factors, but that vacated decision "did not adequately grapple with the deference owed to state-court factual findings under the Antiterrorism and Effective Death Penalty Act." *Id.* After "[g]iving the matter a fresh look," the court concluded our "factual determination was not unreasonable." *Id.* The court further concluded that our Court "reasonably determined that the

trial judge considered all proffered evidence in mitigation," and "[t]he sentencer's obligation to consider mitigating evidence in a capital case does not require that the evidence be credited or given any particular weight in the final sentencing decision." *Id.* at 677–78.

## III. State's Motion to Set Execution Date

At that point, there was no remaining litigation and no stay of execution.

On June 26, 2024, the State filed a Verified Motion to Set Execution Date. It explained that "Corcoran has completed state and federal review of his convictions and sentence." Mot. at 1, ¶ 2. And "[n]ow that the federal courts have denied Corcoran's federal habeas petition, no further grounds for review of the validity of his convictions or sentence are available." *Id.* at 3, ¶ 3. Because "[t]his Court has the exclusive jurisdiction to stay the execution of a death sentence as well as the duty to order a new execution date when the stay is lifted," the State requested that we set the date for Corcoran's execution. *Id.* at 3–4, ¶ 5.

The State Public Defender filed a Response to Motion to Set Execution Date, which began by quoting the dissents from Justice Rucker and Judge Williams, and then arguing that the Court should deny the motion because "executing the unquestionably seriously mentally ill Appellant would violate the Eighth Amendment to the United States Constitution and Article I, § 16 of the Indiana Constitution." Resp. at 1. The evidence on which the State Public Defender relied came from the previous direct appeal record and the previous competency proceedings record. *See id.* at 2 n.1, 18.

We granted the State's motion, explaining our limited role given the procedural posture. We acknowledged that "a petitioner can raise claims involving previously undiscovered evidence through a written petition under Section 35-50-2-9(k), raise constitutional claims through a successive petition for post-conviction relief under Post-Conviction Rule 1(12), or raise challenges to an execution protocol through a civil lawsuit." Order at 2. But Corcoran had not pursued any such claims, and the evidence the

State Public Defender cited in the response brief was not new. *Id.* We therefore granted the State's motion on September 11, 2024, and set an execution date of December 18, leaving over three months for the State to undertake preparations for an execution and for Corcoran to pursue any remaining remedies he believed warranted.

## IV. State Public Defender's Current Motions for Permission to File Successive Petitions

For most of that time, neither Corcoran nor anyone on his behalf pursued any claims. But on November 15, 2024, the State Public Defender filed four submissions in our Court: two motions (with proposed petitions) seeking permission to file two successive post-conviction relief petitions, and two motions to stay the execution (one motion for each petition) while those petitions are litigated.

The first proposed Successive Petition for Post-Conviction Relief argues: (1) that Corcoran's death sentence violates the ban on "cruel and unusual" punishments in the Eighth Amendment to the U.S. Constitution because he is severely mentally ill, and executing the severely mentally ill is cruel and unusual; (2) Corcoran's death sentence violates the ban on "cruel and unusual punishments" in Article One, Section 16 of the Indiana Constitution for the same reason; and (3) Corcoran's death sentence violates the Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution because the State is treating the severely mentally ill different than the intellectually disabled and juveniles, whom the State will not execute. The second proposed Successive Petition for Post-Conviction Relief argues that "Corcoran is not currently competent to be executed under *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Ford v. Wainwright*, 477 U.S. 399 (1986)," because the State Public Defender does not believe Corcoran can "rationally understand his execution or the reason for it." [Second] Successive Pet. for Post-Conviction Relief at 1–2, 15.

We have jurisdiction because of the death sentence, Ind. Appellate Rule 4(A)(1)(a), and we expedited briefing on the motions. That briefing closed

on December 3, 2024, fifteen days before the execution date. Each member of the Court reviewed the submissions as they were filed, and the Court discussed the submissions at a conference after the briefing concluded. To afford counsel the benefit of the remaining time before the execution date to pursue any relief they believe appropriate in the federal courts, we immediately issued an order reflecting the Court's decision denying the motions on December 5, with this opinion explaining the reasoning a few days later.

## Discussion and Decision

"Any person who has been convicted of, or sentenced for, a crime by a court of this state," Ind. Post-Conviction Rule 1(1)(a), "has the right to collaterally attack that conviction or sentence through a petition for post-conviction relief." *Shaw v. State*, 130 N.E.3d 91, 92 (Ind. 2019). "But a second or successive post-conviction petition cannot be filed without prior authorization from this Court (in capital appeals) or the Court of Appeals (in all other appeals), either of which 'will authorize the filing of the petition if the petitioner establishes a reasonable possibility' that the petitioner is entitled to relief." *Id.* (quoting P-C. R. 1(12)). "By permitting successive post-conviction petitions only when the petitioner makes some showing of merit, this appellate screening function reduces the burden on trial courts." *Id.*

"In deciding whether a petitioner has made the required showing, we consider the applicable law, the successive post-conviction papers, materials from the prior appeals and post-conviction proceedings including the record, briefs and court decisions, and any other material we deem relevant." *Wrinkles v. State*, 915 N.E.2d 963, 965 (Ind. 2009). "Post-conviction proceedings are not a 'super-appeal'; rather, the grounds enumerated in the Post-Conviction Rules are limited to issues that were not known at the time of the original trial or that were not available on direct appeal." *Shaw*, 130 N.E.3d at 92–93 (quotations omitted). If we were to authorize the successive post-conviction petitions proposed here, Corcoran would have a right to appointed counsel, and the case would return to the trial court for proceedings consistent with Post-Conviction

Rule 1(12)(c). *See Baird v. State*, 833 N.E.2d 28, 30 (Ind. 2005), *cert. denied*, 546 U.S. 924 (2005).

Corcoran has informed us that he does not wish to assert any further claims in the courts, including that he does not wish to file any successive petitions for post-conviction relief. His affidavit states bluntly: "I, Joseph Edward Corcoran, do not wish to litigate my case further." Affidavit at 1—2, ¶ 3; *id.* ("I am hereby making this statement to the Court through this affidavit: I do not wish to proceed with more and/or endless litigation."). The State Public Defender confirms that remains his wish. [Second] Mot. for Stay of Execution at 6 ("Indeed, currently, Mr. Corcoran wants to be executed . . . .").

Nevertheless, the State Public Defender seeks permission to file two successive post-conviction relief petitions on his behalf anyway. The State argues we should not authorize the filings because Corcoran has not signed them and does not authorize them, and even if he had signed or authorized them, there is not a reasonable possibility that he is entitled to post-conviction relief. We agree with the State that we must deny the State Public Defender's motions for two independently sufficient reasons.

First, Corcoran does not wish to pursue post-conviction relief. Our Court has already concluded he is competent to make that decision, and a key premise of the State Public Defender's submissions is that nothing has changed about Corcoran's condition since then. Second, the submissions do not demonstrate a reasonable possibility that Corcoran is entitled to relief.

## I.   Corcoran's Competency to Waive Post-Conviction Relief

As we held in the previous appeal of the post-conviction court's determination that Corcoran is competent to waive post-conviction remedies, a petitioner seeking those remedies must authorize the petition unless they are incompetent to do so. *Corcoran v. State*, 820 N.E.2d 655, 663 (Ind.), *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005) ("Corcoran himself did not authorize this proceeding within the timeframe required by Criminal Rule

24(H) and without his authority, neither the trial court in this proceeding nor this Court has jurisdiction to review claims for post-conviction relief."). The State Public Defender says that, for a couple reasons, it doesn't matter that Corcoran didn't sign the two proposed petitions, but we disagree with each.

First, the State Public Defender argues that "attorneys are agents of their clients," so they can always sign on their client's behalf. Reply at 13. This argument misses the more fundamental point: "It is the primary duty of an agent to obey the instructions given by the principal," and "[t]he essence of an agency relation is the right of the principal to give directions that the agent is under a duty to obey as long as they remain the agent." 2A C.J.S. Agency § 295; *see also* Restatement (Third) of Agency § 8.09(2) (Am. Law Inst. 2006) ("An agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal."). So even if the attorneys are Corcoran's agents who can sign filings on his behalf, he still has to authorize them to file the successive petitions unless he is incompetent to waive post-conviction relief. *Corcoran*, 820 N.E.2d at 663.

That competency question has been thoroughly litigated in both state and federal courts, which have concluded Corcoran is competent to waive post-conviction remedies after reviewing the same extensive evidentiary record that the State Public Defender relies on now. As the Seventh Circuit described, our Court "gave careful consideration of all the evidence presented at the post-conviction hearing" and then concluded Corcoran "had a clear awareness of the status of his case and what was at risk if he waived further review," and that "his request to waive further proceedings was based on his belief that death is a just punishment for his crimes." *Corcoran v. Buss*, 551 F.3d 703, 712 (7th Cir. 2008), *cert. granted, judgment vacated sub nom. Corcoran v. Levenhagen*, 558 U.S. 1 (2009), *and opinion reinstated sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011).

Second, the State Public Defender argues it would be bad policy "to deprive a mentally ill person access to the court to litigate competency simply because they do not sign a petition." Reply at 14. Depriving that

access, the argument goes, would deny the person of "access to the courts to evaluate their mental illness because of their mental illness." *Id.* at 15. But Corcoran's competency to waive post-conviction relief has already been litigated in state and federal courts. And the State Public Defender does not claim Corcoran's condition has changed such that while he was previously competent to waive post-conviction remedies, he is no longer competent. Instead, the State Public Defender confirmed Corcoran's condition is the same as it has been for decades. [Second] Successive Pet. for Post-Conviction Relief at 14 ("*As he has for twenty years*, he experiences auditory hallucinations, psychosis, and the ever-present delusions . . . ."(emphasis added)).

Because our Court has concluded that Corcoran is competent to waive post-conviction remedies and he has again elected to do so, we do not authorize the successive petitions.

## II. Appellate Screening

The State Public Defender's motions fail for another reason: they do not demonstrate a reasonable possibility that Corcoran is entitled to post-conviction relief through either petition.

### A. First Proposed Petition

The first proposed petition seeks relief based on arguments that Corcoran's death sentence violates: (1) the ban on "cruel and unusual" punishments in the Eighth Amendment to the U.S. Constitution because he is severely mentally ill, and executing the severely mentally ill is cruel and unusual; (2) the ban on "cruel and unusual punishments" in Article One, Section 16 of the Indiana Constitution for the same reason; and (3) the Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution because the State is treating the severely mentally ill different than the intellectually disabled and juveniles, whom the State will not execute. There is no reasonable possibility of success on this petition for at least two threshold reasons.

First, the State Public Defender lacks standing to make these arguments. As we said the last time these arguments were made on Corcoran's behalf contrary to his wishes: "We hold that the State Public Defender does not have standing to raise the other claims she presents without Corcoran's consent." *Corcoran v. State*, 820 N.E.2d 655, 664–65 (Ind.), *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005). We agreed with the State that the State Public Defender's standing was limited to litigating Corcoran's competency to waive post-conviction relief. *Id.* at 658.

Second, as we also observed in that opinion, these arguments "appear to constitute free-standing claims of error that would not be available for post-conviction review." *Id.* at 663. "Indiana's Post-Conviction Rule 1(8) addresses res judicata and procedural default." *Isom v. State*, 235 N.E.3d 150, 151 (Ind. 2024). That rule says: "All grounds for relief available to a petitioner under this rule must be raised in his original petition." P-C.R. 1(8). "The petitioner may raise new claims in a successive petition only if the unraised claims 'could not have been raised in earlier proceedings.'" *Isom*, 235 N.E.3d at 152 (quoting *Matheney v. State*, 834 N.E.2d 658, 662 (Ind. 2005)).

"Unraised claims that are 'knowingly, voluntarily and intelligently waived . . . may not be the basis for a subsequent petition' absent a sufficient reason [they were] not asserted.'" *Id.* (quoting P-C.R. 1(8)). "Unraised claims that should have been raised previously are waived or 'procedurally defaulted.'" *Id.* (quoting *Matheney*, 834 N.E.2d at 662). "Our res judicata doctrine bars relitigating post-conviction claims that have already been decided." *Id.* (cleaned up). Claims that it would be unconstitutional for the State to execute Corcoran because of his mental illness could have been, and indeed were, raised in the previous proceedings. *Corcoran*, 820 N.E.2d at 657, 662 (rejecting the claim that "it would be unconstitutional to execute a severely mentally ill person, such as Corcoran" (quotations omitted)).

Because the State Public Defender lacks standing to raise these claims, and procedurally defaulted claims have no chance of success anyway, the State Public Defender has not demonstrated a reasonable possibility of success with the first-filed petition.

## B. Second Proposed Petition

The State Public Defender's second Successive Petition for Post-Conviction Relief argues Corcoran is not competent to be executed. Specifically, she argues that "Corcoran is not currently competent to be executed under *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Ford v. Wainwright*, 477 U.S. 399 (1986)," because, she says, Corcoran cannot "rationally understand his execution or the reason for it." [Second] Successive Pet. for Post-Conviction Relief at 1–2. Like the first petition, this petition does not demonstrate a reasonable possibility that Corcoran is entitled to relief.

### 1. Eighth Amendment Limitations

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, and that prohibition is applicable to the States through the Fourteenth Amendment, *Jones v. Mississippi*, 593 U.S. 98, 105 (2021). The United States Supreme Court interprets that bar on cruel and unusual punishments as prohibiting the execution of a prisoner who has "lost his sanity" after sentencing, *Ford*, 477 U.S. at 406, which, in this context, means they "are unaware of the punishment they are about to suffer and why they are to suffer it," *id.* at 422 (Powell, J., concurring); *see also Timberlake v. State*, 858 N.E.2d 625, 628–29 (Ind. 2006) (explaining that "persons are incompetent to be executed if they are insane; persons are insane if they are unaware of the punishment they are about to suffer and why they are to suffer it").

"The critical question is whether a prisoner's mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution." *Madison v. Alabama*, 586 U.S. 265, 269 (2019) (cleaned up). In other words, "the issue is whether a prisoner's concept of reality is so impaired that he cannot grasp the execution's meaning and purpose or the link between his crime and its punishment." *Id.* (cleaned up). Prisoners are "presumed to be" competent to be executed. *Timberlake*, 858 N.E.2d at 628. And to litigate the question of competence to be executed, the movant must make a "substantial threshold showing," *Panetti*, 551 U.S. at 949, that their mental illness prevents them from

"'rational[ly] understanding' why the State seeks to impose" the death penalty, *Madison*, 586 U.S. at 267.

A couple key considerations inspire the U.S. Supreme Court's understanding that the Eighth Amendment prohibits executing those who lack a rational understanding of the execution even though their mental illness does not excuse their crime and they were competent to be convicted. One is "a moral intuition that killing one who has no capacity to understand his crime or punishment simply offends humanity." *Id.* at 268 (quotations omitted). And the other is "the lack of retributive value in executing a person who has no comprehension of the meaning of the community's judgment." *Id.*

## 2. Corcoran's Competency to be Executed

We agree with the State that the State Public Defender has not made the substantial threshold showing that Corcoran's mental illness prevents him from rationally understanding why the State seeks to impose the death penalty. To the contrary, Corcoran has demonstrated that he does have a rational understanding. As he explained in his recent affidavit, he "understand[s] that if this Court rejects [his] counsel's petition the death warrant will be carried out." Affidavit at 2, ¶ 4. He "will then be put to death for the heinous crime [he] committed," and he understands the "execution will end [his] life." *Id.*

His rational understanding includes the State's reason for executing him. He explains: "I understand the execution, in the interest of judgment, serves as both a punishment and a deterrent." *Id.* He also has a sophisticated, rational understanding of the proceedings. He says in his affidavit: "I remind this Court that my competence to waive my appeals has been adjudicated throughout the extensive appeal process." *Id.* at 2, ¶ 5. And while he understands counsel's strategy "to delay any and all executions through endless litigation" with the "hope to set a precedent so all future death penalty cases can be endlessly litigated effectively putting an end to all executions," *id.* at 1, ¶ 2, he does "not wish to litigate [his] case further," because he is "guilty of the crime [he] was convicted of," and he "accept[s] the findings of all the appellate courts," *id.* at 1–2, ¶ 3.

"The long drawn out appeal history has addressed all the issues [he] wished to appeal." *Id.*

That reaffirms what he has been saying for twenty years, and what we've previously considered to be a rational understanding. In the competency proceedings to evaluate whether he could waive post-conviction review, the courts credited his testimony that he understood that he was being executed "for what [he had] done," and he agreed "the death penalty is a just punishment for four counts of murder." *Corcoran*, 820 N.E.2d at 660–61. He said the same thing to the federal courts, explaining that "since [he is] guilty of murder," he "should be executed." Ex. 2 to Resp. in Opp'n to Mots. at 1. And he still thought "the death penalty is a just punishment for someone who is guilty of four counts of murder." *Id.*

The State Public Defender argues that while Corcoran has a *factual* understanding that the State is going to execute him as punishment for his crime, that doesn't necessarily mean he has a *rational* understanding. And the State Public Defender points to *Panetti* to illustrate the distinction. In *Panetti*, the prisoner understood the state was saying that it wished to execute him for his murders, but "he believe[d] in earnest that the stated reason [was] a 'sham' and the State in truth want[ed] to execute him 'to stop him from preaching.'" 551 U.S. at 955. The U.S. Supreme Court explained that "the principles set forth in *Ford* are put at risk by a rule that deems delusions relevant only with respect to the State's *announced* reason for a punishment or the fact of an imminent execution, as opposed to the *real* interests the State seeks to vindicate." *Id.* at 959 (citation omitted) (emphases added). So if a prisoner is under the delusion that the State's stated reasons for punishment are a sham, then the prisoner is incompetent even though they understand what the State is claiming are the reasons.

But that isn't the case here. The State Public Defender doesn't claim, and there is no substantial threshold showing that, Corcoran has a delusional belief that the State has some reason for punishing him other than the reasons the State claims. No doubt, the State Public Defender points to evidence that some of Corcoran's other beliefs are irrational, but

his understanding of his execution is not. Virtually all the evidence the State Public Defender cites is the evidence we previously considered when determining Corcoran could waive post-conviction remedies. She does identify minimal new evidence—Corcoran's recent writings which reflect continued delusional thinking. But that is offered only to demonstrate that Corcoran's condition remains the same, not that it has changed and he is no longer competent to be executed. [Second] Successive Pet. for Post-Conviction Relief at 14 ("Now in 2024, Mr. Corcoran continues to suffer the debilitating symptoms of his paranoid schizophrenia. As he has for twenty years, he experiences auditory hallucinations, psychosis, and the ever-present delusions . . . ."); *id.* at 15 ("In short, Mr. Corcoran's longstanding and documented mental illness continues to torment him *as it did at the time of the 1997 offense*." (emphasis added)).

Many capital cases involving prisoners with similar mental illnesses illustrate that a prisoner can suffer from delusions that do not render them incompetent for execution. For example, in *Timberlake*, our court rejected the *Ford* claim even though Timberlake suffered from chronic paranoid schizophrenia because he had "the mental capacity to understand that he [was] about to be executed and why." *Timberlake*, 858 N.E.2d at 626. Timberlake suffered under "a paranoid delusional system resulting in his belief that a secret machine, operated by the government, controls, monitors and tortures people through their brains." *Id.* at 629.

Nevertheless, Dr. George F. Parker—who also examined Corcoran, *Corcoran*, 820 N.E.2d at 661—explained after examining Timberlake that while it was "abundantly clear that Mr. Timberlake was severely mentally ill, and suffers from essentially continuous auditory hallucinations," he "remained relatively organized regarding his legal status," and he "demonstrated an awareness that he had been convicted of the murder of a state police officer and had been sentenced to death as a result of his conviction." *Timberlake*, 858 N.E.2d at 629. Thus, "despite abundant evidence of psychotic systems, including constant auditory hallucinations and a complex and organized paranoid delusional system, it was clear . . . that Mr. Timberlake had the mental capacity to understand that he was about to be executed and why he was to be executed." *Id.* at 629–30. Based

on that evidence, we denied the request for further review and set an execution date. *Id.* at 630.

The State Public Defender has provided plenty of evidence that Corcoran suffers from a mental illness. But despite his mental illness, Corcoran has demonstrated he understands why he is being executed, and the State Public Defender has not provided any evidence suggesting that Corcoran's understanding is irrational. When concluding that Corcoran was competent to waive post-conviction remedies, we concluded that he has a non-delusional understanding of these legal proceedings. And part of what we relied on was his "reasoning that his death sentence is commensurate with the crime he committed (the conclusion to which both the original trial court jury and judge came)." *Corcoran*, 820 N.E.2d at 661.

We acknowledge, as the State Public Defender argues, that the inquiries for competency to waive post-conviction remedies and competency to be executed are not identical, and a claim challenging competency for execution is not ripe until the execution is scheduled. But those inquiries do overlap where it is relevant here. Our determination that Corcoran could waive his post-conviction remedies included an analysis of whether his mental illness interfered with his ability to understand why the State was executing him. And now that a challenge to competency for execution is ripe, there is no indication that Corcoran's understanding of why he is to be executed has changed. Every indication is that it remains the same. At bottom, the State Public Defender's arguments are rehashing the debates between the majorities and the dissents in the previous state and federal opinions evaluating Corcoran's competency, and that is not an adequate basis for further delaying the execution.

There is therefore no substantial threshold showing that Corcoran is not competent to be executed.

## III. Motions for Stay

The two pending motions seek a stay of execution so that the successive petitions can be litigated. Because we do not authorize those petitions, we deny both motions for stay.

# Conclusion

For these reasons, we decline to authorize the petitions for successive post-conviction relief, and we deny the requests for a stay of execution. Our rules permit—but do not require—a petition for rehearing. Rehearing should not be sought if counsel intend to again make the arguments we have already addressed. But if they do petition for rehearing, the petition must be filed no later than 12:00 p.m. on Thursday, December 12, 2024. The State's response must be filed no later than 12:00 p.m. on Friday, December 13, 2024. There will be no further responsive briefing, and no extensions of time for filing will be granted.

Massa and Slaughter, JJ., concur.
Goff, J., dissents with separate opinion in which Rush, C.J., joins.

ATTORNEYS FOR PETITIONER
Amy E. Karozos
Public Defender of Indiana

Joanna L. Green
Laura L. Volk
Deputy Public Defenders
Indianapolis, Indiana

Laurence E. Komp
Federal Public Defender Office
Kansas City, Missouri

ATTORNEYS FOR RESPONDENT
Theodore E. Rokita
Attorney General of Indiana

Angela Sanchez
Chief Counsel of Appeals

Tyler Banks
Deputy Attorney General
Indianapolis, Indiana

**Goff, J., dissenting.**

There is no penalty more severe—more irrevocable—than death. So, when reviewing cases imposing this penalty, justice demands not haste but precision and care. Guaranteeing this demand constitutionally requires ensuring a prisoner is competent to be executed.

A trio of decisions from the U.S. Supreme Court provides the proper considerations. In *Ford v. Wainwright*, the Court held that the Eighth Amendment prohibits executing prisoners "whose mental illness prevents" them "from comprehending the reasons for the penalty or its implications." 477 U.S. 399, 417 (1986). The Court later clarified that the question is whether the prisoner can "reach a rational understanding of the reason for the execution." *Panetti v. Quarterman*, 551 U.S. 930, 958 (2007). And, most recently, the Court recognized that execution "lacks retributive purpose when a mentally ill prisoner cannot understand the societal judgment underlying [their] sentence." *Madison v. Alabama*, 586 U.S. 265, 279 (2019). To that end, "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Panetti*, 551 U.S. at 959. When an evidentiary threshold showing is made that a prisoner lacks this understanding, a hearing must be held to evaluate competency. *See id.* at 949–50; *Baird v. State*, 833 N.E.2d 28, 29 (Ind. 2005). And this showing can be made through "observations by lay persons, including a prisoner's attorney, and older assessments by experts." *Timberlake v. State*, 858 N.E.2d 625, 627 (Ind. 2006).

The evidence submitted by Corcoran's attorneys reveals a documented history of severe mental illness, an inability to cooperate with counsel, and a desire to be executed to escape prison—all of which raise substantial questions about his current mental capacity. As a result, we should stay Corcoran's execution to allow his attorneys to seek successive post-conviction relief to litigate his current competency. But at a minimum, we should stay Corcoran's execution and order a psychiatric examination.

# I. Evidence submitted by Corcoran's attorneys raises substantial questions about his competency to be executed.

The critical question under the Eighth Amendment is whether Corcoran's "mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution." *Madison*, 586 U.S. at 269 (cleaned up). In other words, we must ask whether Corcoran's "concept of reality is so impaired that he cannot grasp the execution's meaning and purpose or the link between his crime and its punishment." *Id.* (cleaned up).

The evidence before us—consisting of prior expert evaluations and contemporary accounts and reports—raise significant concerns about whether Corcoran has the requisite rational understanding.

## A. Every medical expert to have examined Corcoran has found him to be seriously mentally ill.

At various points throughout Corcoran's capital proceedings, at least five different medical experts have found him incompetent. In 1999, two psychiatrists—Dr. Philip Coons and Dr. Larry Davis—concluded that Corcoran's paranoid schizophrenia prevented "his ability to assist his attorney in his defense," effectively rendering him incompetent to stand trial. Def.'s Pre-Sent. Memo., Supp. R. Vol. 1, pp. 23, 24. And at a 2003 post-conviction competency hearing, three experts—forensic psychiatrist Dr. George Parker, clinical psychologist Dr. Robert Kaplan, and neuropsychologist Dr. Edmund Haskins—testified to Corcoran's incompetency to waive his appeals. Post-Conviction Comp. Tr., pp. 13, 59, 66. According to these experts, Corcoran was not engaging in rational decision-making but electing to avoid post-conviction review because of his delusion that the prison was torturing him with an ultrasound machine. *Id.* at 11–12, 14, 50, 53, 66–67.

To ignore these findings now and proceed with execution without a current competency evaluation amounts to enabling his delusions—a

state-sanctioned escape from suffering rather than a measured act of justice. *See Panetti*, 551 U.S. at 960 (recognizing that "[t]he beginning of doubt about competence . . . . is a psychotic disorder").

## B. Corcoran's mental illness distorts his ability to rationally engage with the legal process.

Corcoran has consistently displayed an inability to cooperate with counsel and act rationally throughout his legal proceedings. His trial counsel recently submitted affidavits confirming that Corcoran's reasons for rejecting the State's plea offer "defied logic" and that they had "difficulties . . . consulting with Corcoran in a rational or logical manner." Affidavit of Mark Thoma, pp. 1, 3; Affidavit of John Nimmo, p. 1. To those points, Dr. Coons explained at trial that Corcoran's "refusal to accept either a plea bargain or a bench trial without the death penalty was a product of his mental illness." Def.'s Pre-Sent. Memo., Supp. R. Vol. 1, p. 24. As explained in Section I.A, evidence shows during post-conviction proceedings that Corcoran continued to lack a rational understanding of his decisions; the same was true during his federal habeas proceedings. Corcoran's Reply Br. at 3–4. And just last week, Corcoran's attorneys observed that he has never been able to "assist counsel with his defense" or "make rational decisions about his case." *Id.* at 4–5.

Corcoran's persistent refusal to cooperate with counsel underscores his impaired ability to assess and act on his own legal options. This is not a tactical choice; it is the result of his mental illness, as documented by expert testimony over decades. Allowing a person to "volunteer" for execution—whether by choosing to withhold mitigating evidence at sentencing, waiving the right to appellate review, or electing not to seek post-conviction relief—threatens to undermine the state's heightened-reliability interests in death-penalty cases, Anthony J. Casey, *Maintaining the Integrity of Death: An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings*, 30 Am. J. Crim. L. 75, 76–77, 97 (2002), and ultimately "threatens to diminish public confidence in the integrity of the judicial system," *Wright v. State*, 168 N.E.3d 244, 262 (Ind. 2021). Corcoran's constant irrational behaviors raise

constitutional red flags that demand scrutiny. *See* Richard J. Bonnie, *Mentally Ill Prisoners on Death Row: Unsolved Puzzles for Courts and Legislatures*, 54 Cath. U. L. Rev. 1169, 1181 (2005) ("The possibility, however slim, that incompetent individuals may not be able to assist counsel in reconstructing a viable factual or legal claim requires that executions be barred under these circumstances.").

Additionally, considering this Court previously recognized counsel's standing to litigate Corcoran's competency to waive post-conviction relief on his behalf without written consent, *see Corcoran v. State*, 820 N.E.2d 655, 658, 664–65 (Ind. 2005), I see no reason for depriving counsel of standing to litigate the question of Corcoran's current competency on his behalf.

### C. Contemporaneous evidence reinforces Corcoran's attorneys' incompetency claim.

Corcoran's well-documented paranoid schizophrenia and delusions have persisted for decades. In his world, he suffers from a speech disorder that causes him to unintentionally disclose his innermost thoughts to others as he sleeps. Compounding this paranoia, he believes prison guards perpetually torture him with an ultrasound machine. So pervasive are these delusions, Corcoran's attorneys submit, that he simply "cannot rationally understand the true reason for his execution." Reply Br. at 7. In his mind, Corcoran views execution not as punishment but as the only path to escaping the torment from which he suffers.

Contemporaneous evidence bolsters these observations. In March 2024, for example, medical records from the Department of Correction reported an "observable concern" with Corcoran's "expressed delusions," noting his belief that an "ultrasonic machine" perpetually controls his "thoughts, sleep, voice, etc." Memo. in Support of Successive PCR, Att. A, pp. 2, 3. And in a recently published "whistle-blower report," Corcoran, writing under a pen name, perpetuates these delusions, describing the use of "ultrasonic surveillance devices" by "correctional staff and other individuals and/or agencies" and the effect these devices have on him and other prisoners. JC Chase, *A Whistle-blower Report: Electronic Harassment* 18 (July 2024), Memo. in Support of Successive PCR, Att. B.

## II. Because ample evidence raises uncertainty over Corcoran's current competency, a short stay is warranted for the necessary evaluation.

While "delusions come in many shapes and sizes . . . not all will interfere with the understanding that the Eighth Amendment requires." *Madison*, 586 U.S. at 279. And here, Corcoran has made several statements indicating that he understands the true meaning and purpose of his execution. In a 2005 affidavit, he considered the death penalty "a just punishment for someone who is guilty of four counts of murder." State's Opp. Resp., Ex. 2. And in a letter to the district court the following year, he insisted that he "intentionally killed four people knowing that such an act was wrong," adding that he "should be executed" for committing such a crime. *Id.*, Ex. 1. These statements align with sentiments he expressed in a recently filed affidavit in which he attested to understanding the execution "as both a punishment and a deterrent." Affidavit of Joseph Corcoran (Nov. 22, 2024), p. 2.

But these statements, according to Corcoran's counsel, reflect only the dissonance of someone attempting to mask their mental illness. Indeed, much like his severe mental illness, Corcoran's attempts to hide his delusions are well-documented. Dr. Coons testified at trial that a "person with paranoid schizophrenia generally minimizes their symptoms"— behavior he found consistent with Corcoran's attempts to minimize his symptoms. R. Vol. 13, p. 2076; *see also* R. Vol. 11, p. 1658 (Dr. Eric Engum, another trial expert, testifying to Corcoran's "secretive" behavior, which he found "consistent with the paranoia and suspiciousness").

In any event, Corcoran's statements do not negate the evidentiary threshold showing that he is incompetent to be executed. They must be weighed against two-plus decades of evidence apparently establishing that his delusions about the ultrasound machine and sleep and speech disorders were and are very real to him. So even if it seems that Corcoran may understand why the State is seeking execution, the point is that we simply do not know. Even a "prisoner's awareness of the State's rationale for an execution," his acknowledgment that "he will be executed," and his

understanding that "the reason the State has given for the execution is his commission of the crimes in question" does not resolve the inquiry into whether he has a "rational understanding of the reason for the execution." *Panetti*, 551 U.S. at 956–58. A competency evaluation is needed not because Corcoran fails to acknowledge the facts of his case, but because evidence shows that his mental illness distorts his ability to have the requisite rational understanding.

Additionally concerning is that Corcoran's writings reflect a desire to be executed to avoid further imprisonment. In 2006, for example, he expressed a desire to waive his appeals to "die and escape" prison, which he characterized as benefit because he didn't "want to live in prison for the rest of [his] life." State's Opp. Resp., Ex. 1. And the recently filed affidavit reflects a similar desire. *See* Affidavit of Joseph Corcoran (Nov. 22, 2024). The death penalty, however, is not a mechanism for granting reprieve from suffering or a means to expedite escape from incarceration. It is the gravest act the State can undertake, reserved for those who bear the full weight of their moral culpability. And thus, honoring Corcoran's request undermines society's interest "in not allowing the death penalty . . . to be used as a means of state-assisted suicide." *Smith v. State*, 686 N.E.2d 1264, 1275 (Ind. 1997). To accommodate Corcoran's expressed desire and authorize an execution sought to avoid continued incarceration violates the dignity of both the defendant and the judicial process.

At a minimum, to comply with constitutional due process requirements, this Court should appoint a psychiatrist to conduct a psychiatric examination of Corcoran to render an opinion on his current mental state. In *Timberlake v. State*, the petitioner made a competence claim like the one advanced here. *See Timberlake v. State*, No. 49S00-0606-SD235 (Ind. Sept. 18, 2006) (unpublished order for mental examination). While we ultimately found that Timberlake failed to make the requisite showing, we came to that conclusion only after we ordered contemporaneous testing—which Corcoran's attorneys have asked us to do. There is simply no reason to refuse this request. To the contrary, given the "irreversibility" of a death sentence, "we should err on the side of caution in carrying out an execution." *Baird*, 833 N.E.2d at 33 (Boehm, J., dissenting).

Such caution is particularly warranted here. Twenty-five years elapsed between Corcoran being sentenced to death and the State filing a petition asking us to set his execution date. We received that request last June, and now, less than six months later, Corcoran is scheduled to be executed with threshold evidence of incompetency. We should reaffirm our commitment to the Eighth Amendment and the principles it upholds by, at minimum, ordering a psychiatric examination of Corcoran's current mental status. Doing so would ensure that this irrevocable punishment aligns with moral culpability and that we are not conflating such punishment with escape.

## Conclusion

Corcoran has been diagnosed with paranoid schizophrenia by multiple experts. Due to that diagnosis, he has persistently displayed an irrational ability to assess and act on his own legal options. And, by his own words, he wants to be executed to avoid being incarcerated for the rest of his life. The bedrock of our constitutional order rests on the premise that punishment must align with moral culpability. With the evidence before us, executing Corcoran without first assessing his current mental competence defies this foundational principle.

For these reasons, and for the reasons above, I dissent from the denial of Corcoran's motion to stay and motion to file a successive petition for post-conviction relief.

Rush, C.J., joins.